■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RAYMOND PITTMAN, Appellant. — Appeals by the defendant from two judgments of the Supreme Court, Westchester County, the first rendered October 18, 1979 (McMahon, J.; Indictment No. 274/79), convicting him of murder in the second degree and robbery in the first degree (two counts), the second rendered February 21, 1980 (McNab, J.; Indictment No. 132/79), convicting him of robbery in the first degree (four counts), criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree (two counts), each upon a jury verdict, and imposing sentences. The appeals bring up for review the denial after a consolidated hearing, of the defendant's motions to suppress evidence (McMahon, J.). Case remitted to Criminal Term to hear and report in accordance with the following memorandum and appeals held in abeyance in the interim. On January 19, 1979 four armed men committed a robbery at a bingo game at the Our Lady of Holy Rosary Church in Yonkers, New York. As they fled from the scene and were passing 78 Lamartine Avenue, one of the robbers fired his weapon to discourage a pursuer. The bullet apparently pierced the wall of the building and was discovered in a dresser drawer in a tenant's bedroom. The next day, two men forced their way into a Yonkers apartment and confronted Cornell Moon, his son, and a woman who was also present. In the course of the robbery that followed, one of the perpetrators shot and killed Moon. On January 21 Detective Anthony Cerasi was told by a confidential informant that two black

men who had been involved in both the church robbery and the Moon homicide were at a specific apartment on Locust Hill Avenue in Yonkers. Acting on this tip, the detective and several other officers went to the apartment and found two men, one of whom was the defendant. Soon after the officers' arrival, a man and woman appeared and claimed to be the tenants of the apartment. It was learned that the defendant himself did not live there but maintained his own apartment on Ravine Avenue in Yonkers. The officers thereupon searched and handcuffed the three men and took them and the woman to police headquarters "under suspicion of a robbery, and homicide." Later that afternoon, a lineup was conducted at which the defendant was positively identified by witness Hugh Fox as a participant in the robbery at the church. Based upon this positive identification and the information previously provided by the informant, Detective Cerasi applied for and obtained a search warrant for the Locust Hill Avenue apartment. The search conducted pursuant thereto uncovered a loaded .38 caliber revolver which ballistics tests immediately proved to be the weapon fired during the escape of the perpetrators of the church robbery. It was later also established to be the weapon used in the Moon homicide. Thereafter, using the information he had thus far gathered, Detective Cerasi applied for and obtained a second search warrant — this for the defendant's Ravine Avenue apartment. There he discovered certain items of evidence including car keys which belonged to Cornell Moon. Subsequently, Moon's son was shown a photograph of the lineup previously conducted and identified the defendant as the man who had shot his father. Finally, Detective Cerasi searched the area outside of the defendant's apartment and discovered two pocketbooks, one belonging to the woman who had been in Moon's apartment during the homicide, the other belonging to one of the victims of the church robbery. The defendant's primary challenge on these appeals is directed at Criminal Term's failure to grant his motions to suppress the foregoing evidence as the tainted product of his unlawful arrest. We are therefore called upon by the parties to examine the questions of when the defendant was arrested, whether the arrest was unlawful and, if so, whether any of the evidence admitted at trial was the tainted fruit of the unlawful detention. Because on this record we are unable to resolve the final question, we remand for further proceedings. It is clear that the defendant was subjected to an arrest when he was first seized at the Locust Hill Avenue apartment. He was searched, handcuffed, and transported to police headquarters, thus suffering an intrusion upon his liberty which, no matter how denominated by the police, was indistinguishable from a traditional arrest and hence required probable cause. (See *Dunaway v New York,* 442 US 200; *People v Finlayson,* 76 AD2d 670, 675, n 2.) In our view, however, probable cause for the arrest was not shown. Detective Cerasi testified that he went to the Locust Hill Avenue apartment based solely upon information he had received from the confidential informant. The detective's testimony was sufficient to establish the personal reliability of the informant, but there was no evidence suggesting the manner in which the informant himself had come by the information he provided. Moreover, there were no independent police observations which supported the informant's accusation, nor was the accusation itself so detailed as to be self-verifying. Thus, the People failed to satisfy the basis-of-knowledge prong of the test by which we measure arrests executed upon an informant's tip. (See *People v Elwell,* 50 NY2d 231; *People v Earley,* 76 AD2d 335; cf. *People v Rodriguez,* 52 NY2d 483.) Having concluded therefore that the initial seizure of the defendant was unlawful, we are obliged to attempt to determine the consequences of the arrest in terms of the admissibility of evidence at trial. Evidence obtained independently of the defendant's detention is, of course, admissible regardless of the legality of the arrest. Thus, the bullet found in the dresser drawer at 78

Lamartine Avenue was properly admitted as was the property abandoned by the defendant and discovered in the area outside his apartment. Moreover, otherwise admissible in-court identification testimony is similarly unaffected by the manner in which the defendant was taken into custody. (See *United States v Crews,* 445 US 463.) And we note in passing that the People established a sufficient independent source for all identification testimony introduced at trial. (See *Manson v Brathwaite,* 432 US 98.) The defendant correctly argues, however, that testimony regarding a pretrial identification is inadmissible if the identification occurred while the defendant was being unlawfully detained. *(United States v Crews, supra.)* At bar, the witness Hugh Fox did in fact testify at trial that he had selected the defendant in a lineup at police headquarters. The defendant vigorously contends that Fox' testimony regarding that lineup identification should have been excluded as the fruit of the unlawful arrest. The defendant argues further that, since the lineup identification itself served as the primary basis for the issuance of the search warrants, all evidence seized pursuant thereto, including the murder weapon, should also have been suppressed. (See *Wong Sun v United States,* 371 US 471.) We need not reach these questions, however, nor need we reach the merits of the People's counterargument that the defendant lacks standing to contest the legality of the search of an apartment in which he does not live (cf. *Rakas v Illinois,* 439 US 128; *United States v Salvucci,* 448 US 83; *Rawlings v Kentucky,* 448 US 98) for we are unable to determine on this record whether the defendant was in fact still being unlawfully detained at the moment he was identified in the lineup. There was testimony at the suppression hearing that, in the course of processing the defendant at headquarters, the police discovered that a warrant had been issued for him, apparently in relation to an unrelated charge. The existence of such a warrant could not salvage the initial arrest since Detective Cerasi and his fellow officers did not know of the warrant at that time. Probable cause, of course, is measured by the facts and circumstances within the arresting officer's knowledge at the time of the arrest. (See, e.g., *Carroll v United States,* 267 US 132, 162; cf. *People v Allende,* 39 NY2d 474.) Nevertheless, at the moment the officers at headquarters learned of the existence of the warrant, they obtained sufficient grounds upon which to detain the defendant and, possessed of such grounds, they were lawfully entitled to place him in a lineup on the unrelated charge of which he was reasonably suspected. (See *People v Pickett,* 71 AD2d 575, affd 52 NY2d 892; see, also, *Rigney v Hendrick,* 355 F2d 710, cert den 384 US 975.) Accordingly, we hold the appeals in abeyance and remit the case to Criminal Term for further proceedings to determine when the police first learned of the warrant and, more specifically, whether information regarding the warrant was received at police headquarters before or after the defendant was identified at the lineup. Mollen, P. J., Hopkins, Titone and Weinstein, JJ., concur.