THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES FOSTER, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Westchester County (McMahon, J.), rendered October 18, 1979 and October 23, 1979, convicting him of murder in the second degree and robbery in the first degree (two counts), upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of the defendant's motion to suppress evidence. Judgment reversed, on the law, motion granted to the extent that the razor seized from the defendant is suppressed, and new trial ordered. On January 20, 1979 two men forced their way into the Yonkers apartment of Cornell Moon. In the course of the robbery that followed, one of the perpetrators seized Moon's son, placing a knife or razor to his throat. The other perpetrator shot and killed Moon. The next day, Detective Anthony Cerasi was told by a confidential informant that two men who had been involved in the Moon homicide and in an earlier robbery were in an apartment on Locust Hill Avenue in Yonkers. Acting solely upon this information, the detective and several other officers went to the apartment where they found Raymond Pittman and defendant James Foster. At a pretrial suppression hearing, Detective Cerasi described the ensuing events as follows: "I advised [the defendant] that they were being taken to headquarters under suspicion of robbery, and homicide, at which time he said, 'I guess you are going to search me,' and advised me he had a razor in his pocket, at which time I put my hand in his right front pocket and removed his razor." After Cerasi seized the razor, Linda and Craig De Frietas arrived at the apartment and told the detective that they were the tenants. The officers thereupon searched and handcuffed the defendant, Pittman, and Craig De Frietas and took them and Linda De Frietas to police headquarters. It was later learned that Mrs. De Frietas was

the defendant's sister. In the course of the subsequent investigation, Pittman was identified by Moon's son as one of the perpetrators, and two search warrants were issued leading to the seizure of tangible evidence. The defendant and Pittman were thereafter jointly indicted, *inter alia,* for the Moon homicide. As against the defendant, the indictment rested largely upon the Grand Jury testimony of his sister, Linda De Frietas, who recounted statements made by the defendant admitting his participation in the homicide. Both the defendant and Pittman were convicted of murder and robbery after a jury trial. On his appeal from the conviction, Pittman challenged the legality of his detention by Detective Cerasi. We found that Pittman had been "searched, handcuffed, and transported to police headquarters, thus suffering an intrusion upon his liberty which, no matter how denominated by the police, was indistinguishable from a traditional arrest and hence required probable cause" (*People v Pittman,* 83 AD2d 870, 871). Concluding that the People had failed to establish probable cause, we held that Pittman had been subjected to an unlawful arrest. Since the circumstances are identical, we reach the same conclusion with respect to the defendant, and hold that, as a consequence of the unlawful arrest, the razor seized from him should have been suppressed. The People argue that, notwithstanding the unlawful arrest, suppression of the razor is not required because it was discovered as a result of the defendant's spontaneous statement. We disagree. The defendant's statement leading to the seizure of the razor was not a free and unprovoked act, independent of the unlawful police conduct (cf. *People v Boodle,* 47 NY2d 398; *People v Townes,* 41 NY2d 97). Rather, it followed and was a direct product of Detective Cerasi's announcement that the defendant was to be taken to police headquarters under suspicion of robbery and homicide. That announcement marked the initiation of the unlawful arrest, and the statement was plainly made in anticipation of the search which followed. Accordingly, since the razor was revealed as a direct consequence of unlawful police action, it was tainted evidence and should have been suppressed (see, e.g., *People v Cantor,* 36 NY2d 106, 114; *People v Baldwin,* 25 NY2d 66; *People v Loria,* 10 NY2d 368). The defendant additionally contends that the court erred at trial by failing to prohibit the prosecutor from impeaching his own witness, the defendant's sister, Linda De Frietas. In view of our determination that a new trial is required, we need not address the defendant's contention. If, at the retrial, the prosecutor should choose to call Mrs. De Frietas as a witness, any question regarding her possible impeachment will be decided under appropriate criteria at the time the issue arises (see CPL 60.35; *People v Fitzpatrick,* 40 NY2d 44; see, also, *People v Fuller,* 50 NY2d 628, 638, n 5). Mollen, P. J., Titone and Rubin, JJ., concur.

Weinstein, J., dissents and votes to affirm the judgment, with the following memorandum: Defendant maintains on appeal that the hearing court erred in failing to suppress a razor taken from his person by the police and, furthermore, that he was deprived of a fair trial when the prosecutor was permitted, over objection, to impeach one of its own witnesses with her Grand Jury testimony. I find both contentions to be without merit. As the majority properly notes, our prior determination that codefendant Raymond Pittman had been subjected to an unlawful arrest (*People v Pittman,* 83 AD2d 870, 871), must apply equally to defendant's arrest, since the circumstances are identical. However, the failure of the People to have established probable cause for the arrest does not require suppression of the physical evidence seized. Defendant's spontaneous revelation that he was in possession of a razor was not a direct and immediate response to his unlawful arrest. On the contrary, it was an independent act not tainted by the unlawful detention (see *People v Boodle,*

47 NY2d 398; *People v Townes,* 41 NY2d 97). Defendant volunteered to the police that he had a razor in his pocket after Detective Cerasi informed the codefendants that they were being taken to headquarters under suspicion of robbery and homicide. Insofar as it was not designed to uncover the razor or any other evidence, the unlawful arrest, which commenced when the codefendants were first seized at the Locust Hill Avenue apartment, "lacked the element of purposeful exploitation which would taint the discovery of the weapon" (*People v Boodle, supra,* p 404). In a case such as this where the arrest (based solely upon the information received from a confidential informant), although illegal, neither provoked the defendant to reveal the subject evidence nor was designed to lead to the discovery of any evidence, the purpose underlying the exclusionary rule would not be served by granting defendant's motion to suppress (see *Brown v Illinois,* 422 US 590, 605; *People v Boodle, supra,* pp 404-405). Accordingly, defendant's motion, *inter alia,* to suppress the razor was properly denied. Defendant's additional contention that the court erred by failing to prohibit the prosecutor from impeaching his own witness, the defendant's sister, Linda De Frietas, is likewise without merit. Mrs. De Frietas had been expected to appear as a key witness for the prosecution. She had unequivocally testified before the Grand Jury that defendant had admitted to her his involvement in the Moon homicide. Before she was called to the stand, however, defense counsel indicated to the court that Mrs. De Frietas "had no desire to testify" and that "she had been threatened by the police". The court nevertheless permitted the prosecutor to call her to the stand. Mrs. De Frietas testified that on the day of the homicide the defendant and Pittman came to her apartment together. Her testimony continued as follows: "Q. When they came into the apartment, will you tell the jury what you saw them do, if anything? A. That's what I have been trying to tell you. I'm unsure now. I don't know. I have been trying to tell you that. Q. I would like you to sit there for a second and think about it. You recall them coming; is that correct? A. Yes. Q. What do you recall occurring at that time? A. That's what I keep trying to tell you now, that what I testified before the grand jury was a mistake. I don't really recall what they said or what they did. What I told you, my brother had read to me from the papers about the man — I don't know. I know what you want me to say, but I can't do it. I can't. I can't. Mr. Orlando, I tried to tell you last week I wasn't certain. I don't know. I don't know." Mrs. De Frietas apparently broke down on the stand. When she was able to continue, the prosecutor attempted to elicit a more definite account from her. "Q. Linda, on January 20, 1979, you stated that Mr. Pittman and your brother James came to your apartment. I had asked you what do you recall seeing them do at that time. Have you had a chance to think about that event? A. I have thought about it for eight months. I have been thinking about it for eight months now, you know, and I remember me and my husband was [*sic*] on the couch. We was [*sic*] watching a movie. My brother entered with the key. Raymond came in as usual, and they always came in * * * you know, me and my husband, we was [*sic*] celebrating, you know, because he was my fiance then. He asked me to marry him that night and we was [*sic*] high, you know, drinking and talking and everything, and now when I really think about it, Mr. Orlando, as I tried to tell you, I am not really sure what they was [*sic*] saying to me. I know what I testified to, but since this case has been going on, I had nightmares, daydreams, everything about this case. I can't separate reality from fantasy. I am really not sure now. I really don't know." Recognizing the potential problem of perjury, the court then assigned counsel to Mrs. De Frietas and ruled that the prosecutor would be permitted to treat her as a hostile witness and to impeach her with her Grand Jury testimony. The prosecutor did so and, significantly,

the court twice admonished the jury that such impeachment went only to the witness' credibility and was not to be considered as evidence-in-chief. CPL 60.35 permits a party to impeach his own witness "only when the testimony of the witness in court *affirmatively damages* the case of the party calling him" (*People v Fitzpatrick,* 40 NY2d 44, 51). However, the Court of Appeals has recognized that (p 52) "harm to a party's case may be psychological as well as direct". In our view, the testimony of Mrs. De Frietas in the case at bar did do psychological harm to the People's case. And her "patently evasive and contumacious responses" were so "clearly intended to affirmatively damage the People's case" as to be the equivalent of the kind of harmful testimony contemplated by the statute (see *People v Fuller,* 50 NY2d 628, 638, n 5). In light of the clear and correct instructions given by the court, I conclude that it did not constitute error for the court to permit the prosecutor to impeach Mrs. De Frietas with her Grand Jury testimony. Under these circumstances, an affirmance of the judgment is warranted.