■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL BIGELOW, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Hayes, J.), rendered February 18, 1983, convicting him of attempted rape in the first degree, sexual abuse in the first degree, assault in the second degree, and assault in the third degree, upon a jury verdict, and imposing sentence.

Judgment affirmed. This case is remitted to the Supreme Court, Kings County, for further proceedings pursuant to CPL 460.50 (subd 5).

On the evening of April 15, 1982, the complainant was assaulted and sexually abused by a man who attacked her as she was on the way home. Two days later, a witness who had observed the attack spotted the defendant and identified him as

the assailant. Police were summoned and the complainant made an on-the-scene identification. Defendant was charged with the crime and, following a jury trial, was convicted of attempted rape in the first degree, sexual abuse in the first degree, assault in the second degree, and assault in the third degree.

Although not raised by defendant in his brief on appeal, our dissenting colleagues have undertaken to review the sufficiency of the evidence underlying the conviction and urge reversal. Under settled principles governing appellate review, however, we are compelled to find that the evidence presented a clear-cut issue of fact, and affirm.

"The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" (*People v Contes,* 60 NY2d 620, 621, quoting *Jackson v Virginia,* 443 US 307, 319). We must view the facts most favorably to the People, who prevailed, and assume that the jury credited the prosecution witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded it (see, e.g., *People v Malizia,* 62 NY2d 755, 757, cert den __ US __, 53 USLW 3324; *People v Barnes,* 50 NY2d 375, 381; *People v Benzinger,* 36 NY2d 29, 32). "The rule is well settled that on the review of a conviction in a criminal case where there is any evidence of guilt, the question of reasonable doubt must be left to the jury * * * and the verdict or decision on the facts must ordinarily be deemed conclusive and will not be disturbed unless it is perfectly clear that it is against the weight of the evidence" (*People v Atlas,* 183 App Div 595, 600, affd 230 NY 629, cited with approval in *People v Joyiens,* 39 NY2d 197, 203).

Viewed in this light, the evidence is clearly sufficient to support the verdict. The victim observed the defendant for approximately 15 minutes in a well-lit walkway during the attack, and unequivocally identified him at trial. The identification was corroborated by three youthful eyewitnesses.

To be sure, there were inconsistencies in the identification testimony. Further, the defendant presented an alibi defense. But all these inconsistencies were before the jury which evidently resolved them against the defendant. "The accuracy of an eyewitness identification presents an issue of fact for jury resolution" (*People v Dukes,* 97 AD2d 445; see, also, *People v Cannon,* 71 AD2d 924) and, as we have noted, "The resolution of questions relating to the credibility of witnesses is properly a function of the jury and * * * may not be overturned lightly on

appeal" (*People v Rodriguez,* 72 AD2d 571; see, also, *People v Marin,* 102 AD2d 14, 33). The triers of the fact are best "able and entitled to assess, at first hand, the credibility and reliability of the witnesses" (*People v De Tore,* 34 NY2d 199, 206, cert den *sub nom. Wedra v New York,* 419 US 1025).

The inconsistencies in the eyewitness identification were fully explored "and there was clearly sufficient evidence in quantity and quality to send this case to the jury for a verdict (*People v Joyiens,* 39 NY2d 197, 203)" (*People v Gruttola,* 43 NY2d 116, 122). The verdict does not rest upon "speculation and conjecture" (*People v Marin, supra,* p 33). Even "apparently uncontroverted alibi testimony * * * [which] is impressive" presents "questions of fact for the jury, to be determined, not only from the words, but also from the demeanor, interest and motives of the witnesses" (*People v Regina,* 19 NY2d 65, 72).

The claimed errors in the alibi charge were not preserved, and do not warrant reversal (*People v Walker,* 104 AD2d 573) and the sentence imposed does not warrant appellate modification (see *People v Suitte,* 90 AD2d 80). Finally, on the facts of this case we decline to exercise interest of justice jurisdiction (CPL 470.15, subd 3, par [c]). Titone, J. P., Lazer and Gibbons, JJ., concur.

Brown, J., dissents and votes to reverse the judgment appealed from, and to dismiss the indictment, with the following memorandum, in which Niehoff, J., concurs.

At about 9:30 P.M. on the evening of April 15, 1982, the complainant was attacked as she made her way home through the Red Hook Houses project in Brooklyn. She described her assailant to the police as male, black, 20 to 30 years old, six-feet to six-feet two-inches tall, 190 to 200 pounds, dark complexion, short-cropped hair and clean shaven. Her cries for help caught the attention of three children and an unidentified man who interrupted the attack. While the three children were not able to see the assailant's face during the attack, they said that they did catch a glimpse of him as he ran from the scene. All three said that complainant's assailant had facial hair — one even claiming he had a beard — but none of them gave any description of the assailant to the police.

On Saturday, April 17, 1982, at about 12:30 P.M., two days after the crime, one of the children, Vernon Holmes, was sitting in his fifth floor apartment when he looked out of the window and observed defendant downstairs in a parking lot working on a car. He told his sister Shonta, who had also been present during the crime, and his mother, that he saw the man who had attacked the complainant. Shonta Holmes also looked out of the fifth floor window and observed defendant. She then told Vicki

Neale, the third child present during the crime, what she had seen. After Shonta Holmes told her that she saw the man who had attacked the complainant, Vicki Neale also viewed defendant from the fifth floor window and she also claimed that she recognized him as the man she had seen two nights earlier. Thereafter, someone — apparently Vicki Neale's mother — called the complainant and told her that her assailant was in the parking lot. The complainant then summoned the police and went with her husband and a neighbor to the parking lot. When the complainant approached the defendant, a police officer asked her if she saw the person who had attacked her and she pointed to the defendant.

Defendant, who resided with his wife and three children in the same housing project as the complainant, testified at the trial in his own defense that he was employed as a bus mechanic for the New York City Transit Authority, previously had been employed as a security guard, and had served in the National Guard. At the time of the trial he was 26 years old and stood six-feet three-inches tall and weighed about 225 or 230 pounds. He had no criminal record except for an eight-year-old misdemeanor conviction for criminal trespass.

In support of his alibi defense, defendant testified that he had been at a bar near 129th Street and Amsterdam Avenue in Harlem from the time he had left work until about 9:00 or 9:15 P.M. on the evening the crime was committed. He claimed that he had taken the subway home and did not arrive at his apartment until about 10:45 P.M. His version of his whereabouts that night and the time of his arrival home was corroborated by a co-worker who was with him in the bar and by his wife who was at home when he arrived. Defendant's wife also testified that defendant, who had a moustache at the time of the trial, had had one for many years.

At the conclusion of the trial, and following extended deliberations during which a number of requests were made for the rereading of portions of testimony relating to the alibi defense, the jury returned a verdict acquitting defendant of the rape charge, but convicting him of attempted rape, sexual abuse and assault. This appeal ensued.

The general rule, of course, is that as appellate Judges we should hesitate to overturn a jury verdict based strictly upon our own evaluation of the witnesses' credibility (*People v Atlas,* 183 App Div 595, affd 230 NY 629). Nonetheless, we are obliged to review the entire record in a criminal case to determine whether the evidence is sufficient in quality and quantity to justify the jury's finding of guilt beyond a reasonable doubt (*People v Reed,*

40 NY2d 204; *People v Santos*, 38 NY2d 173). And it is, of course, fundamental that if, upon such review, we find the record to be deficient, we are obliged to set aside the finding of guilt (*People v Santos, supra*). Unlike the Court of Appeals, however, which may only review the evidence in a case to determine whether it is legally sufficient as a matter of law (CPL 470.35; *People v Contes*, 60 NY2d 620), this court is empowered not only to reverse a judgment of conviction based upon a determination that there is a lack of legally sufficient evidence (CPL 470.15, subd 4, par [b]), but it may also weigh the evidence and, if appropriate, reverse a judgment based upon a factual determination that the verdict is against the weight of the evidence (CPL 470.15, subd 5; see *People v Carter*, 63 NY2d 678). In our judgment, this is such a case.

The identification evidence in this case contains a number of troubling discrepancies. Shortly after the crime, the complainant described her assailant to the police as a black male, six-feet to six-feet two-inches tall, 190 to 200 pounds and about 20 to 30 years old. The defendant, as noted, was six-feet three-inches tall and weighed 225 to 230 pounds. The complainant also claimed that the assailant had short-cropped hair and was clean shaven. The three children, however, each described the assailant as having some type of facial hair — two of them describing him as having a moustache and one even claimed that he had a beard. One of the children also stated that his hair was worn in an Afro. According to his wife, defendant had worn a moustache for a number of years. He also had one at the time of the trial. Complainant made no mention in her descriptions to the police of her attacker having had any facial hair — rather, she specifically described him as being "Clean shaven". And yet she identified defendant, a man who did not fit her description, as her assailant.

Further, the circumstances under which the complainant made her identification at the time of his arrest give rise to serious concerns with respect to the correctness of that identification. The record indicates that, rather than being based upon an independent and spontaneous recognition of defendant, the identification was the result of a strong suggestion made to the complainant in the telephone call from the mother of one of the children who stated that she would find her assailant working on a car in the parking lot. The complainant went to the parking lot with the police to make an identification without independently verifying the reliability of the information relayed to her. Furthermore, the identifications which led complainant to defendant strike us as being particularly unreliable. The initial

identification was based upon an observation from a fifth floor window by a young witness who had had only a brief opportunity to see the assailant's face two nights earlier. That information was then passed on to the other two children who then also made identifications of the defendant from the fifth floor, and then to a woman who was not an eyewitness to the crime, and ultimately to the complainant. Taken together, these facts render the identification evidence extremely weak and unreliable.

In contrast, the defendant has put forth a strong alibi defense which has steadfastly been maintained by him from the moment of his arrest. Significantly, on the evening of the arrest, the Assistant District Attorney who questioned defendant called his co-worker, Kenneth Tutain, to confirm defendant's alibi. Tutain, who apparently had not been in contact with the defendant since the time of his arrest, corroborated in detail defendant's version of his whereabouts on the evening the crime was committed. Obviously, if defendant and Tutain had been together at a bar in Harlem until about 9:00 or 9:15 P.M., it would not have been possible for him to have reached the scene of the crime in Brooklyn by subway at 9:30 P.M., the time of the assault.

We have stated on many occasions that the vagaries of eyewitness identifications are well known (see *People v McCann,* 101 AD2d 843; *United States v Wade,* 388 US 218, 228; see, also, O'Connor, "That's the Man": A Sobering Study of Eyewitness Identification and the Polygraph, 49 St John's L Rev 1; Sobel, Eyewitness Identification, § 1.1), and have noted that there can be no greater miscarriage of justice than the conviction of an innocent man as the result of mistaken identification (*People v Crudup,* 100 AD2d 938; *People v McCann, supra; People v Daniels,* 88 AD2d 392).

Based upon a careful review of the entire record, we conclude that the verdict of guilt was against the weight of the evidence. Our conclusion is based on the combination of the numerous discrepancies in the witnesses' description of complainant's attacker and the suggestive circumstances under which the identification was made, coupled with the strong and consistent alibi testimony. The evidence leaves us with a very disturbing feeling that an innocent man has been convicted (*People v Kidd,* 76 AD2d 665, 668, mot for lv to app dsmd 51 NY2d 882; *People v Crudup, supra*). Accordingly, the judgment should be reversed and the indictment dismissed.

Moreover, even if we were to conclude that the verdict was not against the weight of the evidence, we would still vote to reverse the conviction and order a new trial based upon our view that the trial court's charge on the alibi was inadequate. In charging

the jury with respect to the alibi, the court stated, *inter alia,* that "[y]ou have to determine, after you evaluate the witness's answer or her testimony, as to whether or not you think the testimony regarding the alibi is truthful" and further, "I have already indicated to you that a defense of alibi is, if clearly established by credible testimony, is [*sic*] the very best testimony that a man can offer". A charge of this nature, which may suggest to the jury that the defendant is required to prove the truth of the alibi or that he has any burden at all of establishing the alibi, unconstitutionally relieves the People of their burden of proving guilt beyond a reasonable doubt (*People v Victor,* 62 NY2d 374). In order to overcome the possibly misleading and confusing effect of such a charge, it is imperative that the court unequivocally instruct the jury that the People have the burden of disproving the alibi beyond a reasonable doubt (*People v Victor, supra*). While the court in the case at bar did instruct the jury that the burden rests upon the People at all times to prove defendant's guilt beyond a reasonable doubt and to prove that an alibi is not true, there was no unequivocal instruction that the alibi must be disproved beyond a reasonable doubt. The charge as a whole — particularly in a case such as this — failed to adequately explain to the jury the People's burden with respect to the alibi defense. Although the issue was not preserved for appellate review as a matter of law, based upon the record before us we would reach the issue under our discretionary review power in the interest of justice (CPL 470.05, subd 2; *People v McFadden,* 100 AD2d 520; cf. *People v Walker,* 104 AD2d 573).

This was an extremely close case — indeed, as stated, we are not convinced that guilt has been proven beyond a reasonable doubt — and the issue of guilt turned primarily upon the jury's evaluation of the credibility and reliability of the complainant and the identification witnesses versus that of the defendant and the alibi witnesses. The fact that the jury interrupted their deliberations — which extended over a two-day period — several times in order to have the alibi testimony reread, is indicative of the crucial role that the alibi defense played in the case. In a case such as this, it is absolutely essential that the jury be permitted to deliberate in an atmosphere as error free as possible (*People v McCann,* 90 AD2d 554). Thus, if we were not voting to reverse the conviction and dismiss the indictment on the ground that the verdict is against the weight of the evidence, we would direct that a new trial be held.