■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BOB CHEATHAM, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Queens County (Joy, J.), rendered September 1, 1987, convicting him of sexual abuse in the first degree (two counts), criminal possession of a weapon in the fourth degree, and endangering the welfare of a minor, after a nonjury trial, and imposing sentence.

Ordered that the judgment is reversed, on the facts, the indictment is dismissed, and the matter is remitted to the Supreme Court, Queens County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.

The defendant contends that the People failed to prove his guilt beyond a reasonable doubt because of the inconsistencies in the People's case and the lack of any evidence other than the infant victim's testimony to connect the defendant to the crime. While we are cognizant that the resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the trier of fact (see, People v Gaimari, 176 NY 84, 94), whose determination is to be accorded great deference on appeal (see, People v Garafolo, 44 AD2d 86, 88), in this case the finding of guilt is clearly unsupported by the evidence adduced at the trial.

On March 21, 1985, a 10-year-old girl was sexually abused in a faculty bathroom on the second floor of the Queens elementary school she attended. She did not tell anyone of the incident until nearly a month later when she reported it to a

friend of hers. The police were notified on May 2, 1985, and about two weeks later the defendant was arrested. The defendant was an employee of the New York City Department of Parks and Recreation (hereinafter Parks Department) and worked in the park adjacent to the school.

At the trial, the victim testified that her assailant had been dressed in an all-green work uniform, very much like that worn by the school's janitors, and that there were no patches, badges or other markings on the uniform. However, on the date of his arrest, the defendant was dressed in a Parks Department uniform consisting of a blue shirt with "a round Department of Parks and Recreation patch on the arm". Indeed, a Parks Department supervisor testified that the color of the required employee uniforms had been changed from green to blue several years prior to the date of the alleged incident and that all uniform shirts had the New York City Department of Parks and Recreation patch on them. He also recalled the defendant as having always worn the blue uniform shirt during the time period in question. Moreover, no evidence was adduced to show that the defendant had ever owned, possessed, or even worn, a green uniform shirt.

The victim also testified that her assailant had forced her down one of the three stairways from the third floor of the school to the second floor, whereupon they walked directly towards the faculty bathroom. Once they reached the bathroom, the assailant immediately selected the correct key from a key ring containing a number of keys and unlocked the bathroom door. Despite the fact that the victim's testimony established that her assailant had a certain familiarity with the school building, there was no evidence indicating that the defendant had ever been inside the building. The defendant stated that he had never been inside the school, and both the victim and the school principal partially confirmed this by stating that they had never seen the defendant inside the building. In fact, the defendant had only started working at the park adjacent to the school in January 1985.

Furthermore, the Parks Department did not possess keys for the school building, and the defendant was not issued any keys for the school. In addition, the defendant had a key ring with some 14 keys on it when he was arrested. The arresting officer tried each key in the lock of the faculty bathroom door, but none of them fit. Thus, the inference that the defendant had somehow obtained a key from an unknown janitor with whom he had once talked is mere speculation, unsupported by any factual substance.

In contrast to the lack of any evidence connecting the defendant to the school building, the testimony at trial indicated that the victim uniformly told everyone that she thought her assailant was a janitor. Indeed, the school principal testified that at about the same time as this incident one of the school's custodial helpers was discharged because of complaints by parents that he was making approaches to the girls. However, other than speaking to the chief custodian, the police made no investigation of school personnel after the victim filed her report.

Additionally, the Parks Department payroll records reflect that the defendant worked at the park from 8:00 A.M. to 5:00 P.M. nearly every Monday through Friday beginning in January 1985 until the date he was arrested. Thus, the defendant would be working in the park at the start of the school day, when the students lined up to go into the school, at lunchtime, and at the end of the school day. Yet, although the victim was in the park every school day, and although she lived across the street from the park, she claimed that she had never seen the person who had molested her during the entire two-month period between the incident and the day of the defendant's arrest. Indeed, she stated that she had never seen the man prior to the incident.

Finally, it should be noted that while the victim developed a vaginal infection towards the latter part of March, not only was there no medical evidence establishing a causal link between any alleged abuse and the infection, there was no medical evidence showing any sexual abuse. Moreover, the victim's mother's unsubstantiated testimony that she had perceived changes in the victim's behavior after March 21st was likewise inconclusive. Kunzeman, J. P., Rubin and Balletta, JJ., concur.

Spatt, J., dissents and votes to affirm the judgment appealed from, with the following memorandum: The defendant contends that his conviction should be reversed and the indictment dismissed on the ground that his protestations of innocence and alleged inconsistencies in the testimony of the complaining witnesses rendered the evidence legally insufficient. Alternatively, the defendant argues that the verdict should be set aside as against the weight of the evidence. I find, however, that the sworn testimony of the 12-year-old victim of this crime, who was 10 years old at the time of the crime, provided a rational basis for the court at this nonjury trial to conclude that the prosecution had proved every element of the crimes charged beyond a reasonable doubt (see,

*Jackson v Virginia,* 443 US 307, 319; *People v Contes,* 60 NY2d 620, 621). I further find, upon an independent review of the evidence, that the verdict was not against the weight of the evidence *(see,* CPL 470.15 [5]; *People v Bleakley,* 69 NY2d 490).

It is well settled that, for purposes of appellate review of the legal sufficiency of the evidence, the facts must be viewed in the light most favorable to the prevailing party. Upon our review of the evidence, we should give the prosecution's evidence the full weight that might reasonably be accorded it *(see, e.g., People v Malizia,* 62 NY2d 755, 757, *cert denied* 469 US 932; *People v Barnes,* 50 NY2d 375, 381; *People v Bigelow,* 106 AD2d 448, 449).

Viewed in this light, the evidence in this case was clearly legally sufficient to support the verdict. The victim of the crime testified that on March 21, 1985, she stayed after school at Public School Number 20 in Queens to help her teacher prepare for teacher-parent conferences. At approximately 12:30 P.M., the victim left the classroom located on the third floor of the school accompanied by a classmate. The classmate headed down the stairs to go home, and the victim stopped in the bathroom. While in a bathroom stall, the victim heard footsteps. Although she called out the classmate's name, there was no response. She exited the bathroom and began walking back to the classroom when someone grabbed her from behind. The assailant put one arm around her neck and, with the other hand, held a knife to her throat. The assailant pushed open the stairwell door and dragged the victim down the stairs to the faculty bathroom on the second floor. The assailant used a key which was on a keychain hanging from his waist to open the faculty bathroom door. He then forced the victim into the bathroom, which was approximately 6 by 10 feet in size and lighted, and the door closed behind them.

The victim then stood in a corner of the room facing her attacker. She testified that the defendant put the knife under his foot and told her to take off her clothes. When she did not respond, the defendant pulled off her shirt and skirt himself. He then got down on his knees and kissed her breasts. He then pulled down her panties and "stuck his finger" in her vagina. He then picked up the knife, threatened her that if she told anyone he would kill her, and ran out the door. The victim testified that she was in the bathroom with the defendant "a little less than five minutes".

The defendant conceded at trial, as he does on appeal, that the attack, in fact, occurred. The sole question was the identity of the attacker. The victim described her attacker as a

dark-skinned black man with a mustache, short hair, wearing thick glasses and a green work uniform, who was thin and not "that tall". On cross-examination, she agreed with defense counsel that the perpetrator was about counsel's height, i.e., 5 feet, 11 inches tall. At trial, she unequivocally identified the defendant as the perpetrator.

Significantly, the victim had provided this description of her assailant to the authorities approximately two weeks before the defendant's arrest; and, as evidenced by the photographs of the defendant which were received into evidence and have been reviewed by this court, the defendant matched the description precisely. The arrest photograph taken against a ruler indicated that the defendant is 5 feet 11 inches tall. Furthermore, the information that the crime was committed at a time when the school was nearly empty and that the assailant was dressed in a work uniform commonly worn by maintenance workers and had a key to a school bathroom reasonably indicated that the crime was committed by an individual who had access to the school and the key and had knowledge of the school schedule. The defendant, who was a Parks Department employee assigned to clean the playground surrounding the school, was one such individual.

The defendant testified and presented the testimony of Daniel Sullivan, a park supervisor for the New York City Department of Parks and Recreation. Their testimony established that the defendant had been employed by the Parks Department since 1977; and that between January and May 1985, he was assigned to the park area around Public School 20. His regular work schedule was 8:00 A.M. to 5:00 P.M., Monday through Friday, with a one-hour lunch break which could be taken anytime between 11:00 A.M. and 2:00 P.M. The defendant was the only employee scheduled to work in that park, and he signed in and out on a daily "blotter" sheet according to an "honors system". The "blotter" sheet for March 21, 1985, which was received into evidence, indicated that the defendant signed in at 8:00 A.M., took a lunch break between 12:00 P.M. and 1:00 P.M. and signed out at 5:00 P.M. Although Mr. Sullivan would occasionally drop by the park, there was no evidence that he did so on March 21, 1985. The defendant denied having any involvement in the charged crime and stated that he had never been inside the school building, but could not recall his whereabouts during his lunch hour on March 21, 1985.

The victim's testimony, which was specific as to the details of the crime and certain as to the identification, was sufficient

in and of itself to support the conviction (see, People v Figueroa, 153 AD2d 576 [decided herewith]; People v Danza, 127 AD2d 781; People v Dickson, 112 AD2d 312). Moreover, that identification was supported by the remarkable similarity between the defendant and the victim's description of her attacker as well as the uncontroverted fact that the defendant was in the area of the school at the time of the crime. In the face of this evidence, the defendant argues that the victim's identification of him should not have been credited by the court because the official Parks Department work uniform at the time of this crime was a blue shirt and "brownish" pants with a stripe, rather than green pants and shirt; and because at the time of his arrest approximately six weeks after the crime, he did not have a key to the faculty bathroom on his key chain. However, these facts are not decisive.

With respect to the uniform, Mr. Sullivan testified that sometime in the early 1980's, the Parks Department's uniform was changed from green pants and a green shirt to a blue shirt with a patch on the sleeve and brown pants with a stripe. However, employees who owned the green uniform were permitted to continue wearing it indefinitely. The defendant testified that he acquired the blue uniform shirt in 1983. He admitted that prior to that time, he owned the required green pants; but despite the fact that he worked for the Parks Department for six years during which a green shirt was mandatory, he claimed not to recall whether he ever owned a green uniform shirt. In any event, the defendant further testified that it was his habit to change his clothes in a park building for his lunch period because his uniform often became dirty while cleaning the park. Thus, he easily could have worn the blue uniform while cleaning the park and changed to the old uniform for his lunch break.

The fact that the defendant did not possess the key to the faculty bathroom six weeks later did not render the victim's testimony incredible. There was ample time and opportunity for the defendant to return the key to its owner or otherwise dispose of it. In its written decision, the trial court addressed this issue, noting that "the defendant admitted, on cross-examination, that he had talked to a janitor employed by the school, from which it is not unreasonable to conclude that the defendant had an opportunity to obtain the key from that individual."

Following his arrest, the defendant denied committing the crime but admitted to the detectives that he "used to talk to one of the [school] janitors". Furthermore, after the victim

spontaneously identified the defendant as her assailant in the schoolyard on May 14, 1985, the defendant had an opportunity to dispose of the key during the approximately one-half hour before he was arrested. The evidence established that on May 14, 1985, the victim spotted her assailant in the schoolyard and so informed her teacher. Her teacher sent her to the office of the principal, Benjamin Fallon. Mr. Fallon, who testified at trial, called the victim's mother and, upon the mother's arrival, accompanied the mother and daughter to the schoolyard. At Mr. Fallon's suggestion, the victim and her mother remained approximately six feet away while Mr. Fallon engaged the defendant in conversation. The conversation was merely a pretext to permit the victim a further opportunity to view the defendant. After the victim positively identified the defendant, she went back into the school with Mr. Fallon and her mother. When Mr. Fallon was unable to reach Detective Matthew Fogarty who had been assigned to the case, the victim and her mother walked to a nearby police precinct station house. As they passed the defendant in the schoolyard, the victim's mother noticed that the defendant was watching them.

In support of his claim of mistaken identification, the defendant also makes much of the school principal's testimony that at about the same time as the crime in this case took place, a custodian's helper employed in the school was fired due to complaints by parents that he was "making approaches to the girls by talking to them". The custodian's helper was a light-skinned Hispanic man approximately 5 feet 8 inches, to 5 feet 9 inches tall and "chunky". My review of the photograph of this person, which was received into evidence, reveals that he bore no resemblance to the defendant and, except for his mustache, did not match any aspect of the description provided by the victim. The two men could not be mistaken for one another.

Finally, the remaining alleged inconsistencies in the victim's testimony were minor and completely inconsequential. Testifying two years after the events, it is not surprising that the victim became confused as to whether her teacher was present at a particular meeting or whether or not the defendant was handcuffed when she and her mother returned from the police precinct on May 14, 1985. These factors do not negate her strong and convincing identification testimony (see, People v Ballenger, 130 AD2d 755; People v Reyes, 118 AD2d 666). Furthermore, it is of little consequence that the victim did not spot the defendant in the park near the school where

he worked sooner. The school principal testified that he had never seen the defendant before the day of the arrest. Similarly, the victim's mother and her friend, who testified as an outcry witness, lived near the park and walked by it often, yet never noticed the defendant. Thus, the delay in identification was not unduly long and was not so significant as to render the identification unreliable (see, People v Grant, 118 AD2d 726; People v Herriot, 110 AD2d 851).

Having heard all the testimony and the arguments of counsel and having examined the exhibits received into evidence, the trial court rendered a verdict of guilty of all four counts of the indictment. In its written decision, the court indicated that it had given "special scrutiny" to the victim's testimony "for the purpose of determining competency, credibility and veracity" and had concluded that, "while only 10 years old at the time of the incident [the victim] was forthright and unwavering in her testimony regarding the identification of this defendant as her assailant". The court found that the People's witnesses were "credible and worthy of belief" and, accordingly, that the prosecution had proved the defendant's guilt beyond a reasonable doubt. The accuracy of an eyewitness's identification presents an issue for resolution by the trier of fact (see, People v Tugwell, 114 AD2d 869, 870; People v Greene, 111 AD2d 183, 184; People v Dukes, 97 AD2d 445). I cannot, on this record, find "that the trier of fact has failed to give the evidence the weight it should be accorded" (People v Bleakley, 69 NY2d 490, 495, supra; see also, People v Wiley, 137 AD2d 735, 736). Accordingly, I vote to affirm the judgment of conviction.