■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BENJAMIN FIGUEROA, Appellant.—Appeal by the defendant from a judgment of the County Court, Orange County (Byrne, J.), rendered January 22, 1987, convicting him of rape in the first degree and sodomy in the first degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

The defendant contends that his conviction should be reversed and the indictment dismissed due to alleged inconsistencies in the testimony of the complaining witness, rendering the evidence legally insufficient. Alternatively, the defendant argues that the verdict should be set aside as against the weight of the evidence. We find, however, that the sworn testimony of the nine-year-old victim provided a rational basis for the jury to conclude that the prosecution had proved every element of the crimes charged beyond a reasonable doubt *(see, Jackson v Virginia,* 443 US 307, 319). Viewing the evidence in the light most favorable to the prosecution *(see, People v Contes,* 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict was not against the weight of the evidence (CPL 470.15 [5]).

It is well settled that, for purposes of appellate review of the legal sufficiency of the evidence, the facts must be viewed in the light most favorable to the prevailing party. Thus, it must be assumed that the jury credited the People's witnesses and gave the prosecution's evidence the full weight that might reasonably be accorded to it *(see, e.g., People v Barnes,* 50 NY2d 375, 381; *People v Bigelow,* 106 AD2d 448, 449). Viewed in this light, the evidence in this case was unquestionably sufficient to support the verdict. The nine-year-old victim of these crimes, who was properly sworn after inquiry by the court, testified that on the morning of August 31, 1985, when she was eight years old, the defendant, whom she knew well as a co-worker of her father and a family friend, came to her home. That morning, the victim's parents went shopping for a new car. While they were gone, the victim went to stay with an upstairs neighbor. However, after a while, the victim asked permission from the neighbor to go downstairs and change her

clothes. Once downstairs, she turned on the television. While she was watching a children's program, the defendant came into the room and sat down. The defendant soon told the victim to come over to him and instructed her to lie on her back. He then pulled up the victim's pajamas, pulled down his pants and put his penis in her vagina. After a few minutes, he took her into her bedroom and told her to lie on her stomach on the bed. He then inserted his penis in her rectum. The child testified that it felt "[t]errible" and that she repeatedly told him to stop. After approximately one minute, he removed his penis, pulled down her pajamas and pulled up his pants. The defendant gave the victim $5, instructing her not to tell anyone. He offered her another $5 if she let him do it again, but the child refused. The victim testified that the defendant went into the kitchen where he picked up a washcloth and then went outside. About a minute later, the defendant returned the washcloth and left. About 10 minutes later, the victim's brother entered the apartment. She told him, "don't tell, don't tell", showed him the $5 and told him that "Benny" gave it to her. She then started crying. The child's testimony was, itself, sufficient to establish the defendant's guilt (see, People v Dickson, 112 AD2d 312).

Furthermore, portions of the child's testimony were corroborated by the testimony of her mother, her father, who was called as a defense witness, her brother and the neighbor. All of these witnesses agreed that the defendant came to the home of the victim's family on the morning of August 31, 1985, and was still there when the victim's parents left. The victim's mother and father testified that when they left the house to purchase a new car that morning, the defendant was outside their home, while their daughter was upstairs with the neighbor, and their son (who was 11 years old at the time of the trial) went with a friend to a local diner for breakfast.

The neighbor testified that after the victim came to her apartment, she heard the parent's car pull out of the driveway. After the victim had been in her apartment for approximately 15 minutes, she asked for permission to go downstairs to change her clothes because the neighbor's baby had "spit up" on her. The victim's brother testified that when he came into the apartment after returning from the diner, he found his sister, still in her pajamas, crying. She showed him a $5 bill and told him, "don't tell mom". He asked her where she got the $5, and she told him. The victim's brother waited for his sister to change her clothes, and they went upstairs. The neighbor testified that the victim was gone from the apart-

ment for no more than 20 minutes, and that, when she returned, she watched television and did not speak to anyone.

Indeed, the victim's silence regarding this incident lasted approximately two months and is heavily relied upon by the defendant in his attack on her credibility. However, the testimony provided a reasonable explanation for that silence and presented a triable issue for the jury. The victim explained that she did not report this incident because she was scared and thought something would happen to her. Furthermore, since at the time of this attack the victim's vocabulary did not include words such as "penis", "vagina" and "rectum", it is reasonable to infer that she found it difficult to relate the incident. In addition, according to the victim's mother, she was asked, on a nightly basis, whether anyone had touched her "private parts". Thus, it is inferrable that this young victim remained silent out of concern and even fear that she had allowed someone to touch her "private parts", contrary to her mother's instructions.

The testimony concerning the circumstances under which she finally reluctantly revealed what had happened to her is further support for the authenticity of the event and the emotional upset which prevented her immediate outcry. The victim, her mother and her brother testified that on October 28, 1985, the victim and her brother got into an argument during which the brother threatened "to tell mommy about the five dollars that [the victim] had gotten from Benny". Overhearing this statement, the mother inquired about the money. The children explained that the money came from the defendant, but the victim began crying and refused to explain why he had given it to her. Only when her mother insisted did the victim explain that the defendant had "put his thing in my thing". She went on to explain to her mother what she meant by "thing". The victim's mother immediately reported this incident to the police and took her daughter to the emergency room of a local hospital. Thus, the jury could have reasonably found that the delay in reporting this incident was caused by the immaturity, innocence and fear of the young victim.

In addition, the defendant challenges the victim's credibility based on an error in the victim's testimony concerning which television program she was watching just before the crimes were committed. In her trial testimony approximately one year after the crime, the victim recalled that she had watched "Gummy Bears". However, the director of program analysis for the National Broadcasting Company testified that the

show "Gummy Bears" was not aired until September 14, 1985, approximately two weeks after this crime occurred. The identity of the children's program viewed by the victim is not of such significance as to render the victim's testimony incredible as a matter of law, nor can it be said that the jury's crediting of her testimony was against the weight of the evidence. The jury could have reasonably concluded that the victim confused "Gummy Bears" with another animated show but was not mistaken as to the acts committed upon her by the defendant.

Similarly insignificant is a conflict in the testimony as to whether the victim asked to leave the neighbor's apartment to go downstairs to change her clothes because the neighbor's baby "spit up" on her or because she was cold. This conflict does not bear on the issue of whether the defendant committed the acts for which he stands convicted. "The various inconsistencies in the testimony of the prosecution's witnesses merely posed questions of credibility which were for the trier of fact to resolve" *(People v Titus,* 125 AD2d 428, 429).

In this regard, the defendant contends that the victim gave conflicting testimony concerning when this incident happened because, during cross-examination, she stated that school started four months after the attack. However, the victim clearly stated that the attack took place on the day her parents went shopping for a new car. This testimony was confirmed by the testimony of a number of other witnesses, including the defendant, that he was at the victim's house on August 31, 1985, when the victim's parents went shopping for a new car. A bill of sale for a car purchased by the parents that day was received into evidence. In light of this testimony, the young child's error, under cross-examination, concerning when school commenced, was inconsequential. Those mistakes were not of such a degree or nature as to render the child incredible as a matter of law *(see, People v Brown,* 141 AD2d 657, 658; *People v Ballenger,* 130 AD2d 755; *People v Reyes,* 118 AD2d 666). Resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the jury, which saw and heard the witnesses *(see, People v Gaimari,* 176 NY 84, 94). Its determination should be accorded great weight on appeal and should not be disturbed unless clearly unsupported by the record *(see, People v Garafolo,* 44 AD2d 86, 88).

In addition to the aforementioned incriminating evidence, the People produced Detective Barry Bernstein who, after interviewing the victim and her mother, confronted the defen-

dant with the accusations. Initially, the defendant denied being at the victim's home on the day in question. When confronted with the statement of the victim's mother that he had been there, he admitted that he had been there but insisted that the victim's brother had also been present and that he had not engaged in sexual conduct with the victim.

Dr. James Oxley, an internist who happened to be on duty at the hospital emergency room and who examined the victim on October 28, 1985, testified that he found no lacerations or scarring. However, he found that the victim's hymen was open and drew the hymen, to scale, in the hospital record, which was received into evidence. The hospital record contains the following: "child states that approx 2 mos ago a man named Benny pulled her pajama bottom up and laid on top of her after taking his pants down. She says she had pain in vaginal area and felt him pushing into her".

Without explicitly offering an opinion as to penetration, the doctor stated that the open hymen had "no significance" but agreed that "the hymen could have been open by sexual abuse or by something other than sexual abuse". A certified medical record reporting the absence of a hymen in a young victim has been recognized as corroboration of a charge of sexual abuse (see, Matter of Nicole V., 71 NY2d 112, 122).

On the question of sexual abuse, Dr. Oxley gave the following contradictory and confusing testimony:

"Q Did you make any finding, diagnosis?

"A The diagnosis I put on the chart was ruled out sexual abuse.

"Q Could you explain to us what you mean by that?

"A By that diagnosis I meant that based on the physical exam I could not say yes or no that the child had been sexually abused.

"Q You could not tell?

"A That is correct. * * *

"Q Did your examination show any sexual abuse at all?

"A No."

Dr. Oxley testified that he had no special training in gynecology or pediatrics and had limited experience in performing gynecological examinations on children.

The defendant testified and presented two defense theories, i.e., that the victim had fabricated the entire event or that another person named "Benny" may have committed these crimes. He admitted that he was acquainted with the victim

and her family since 1983 and that he went to their home on the morning of August 31, 1985. He testified that he met the neighbor who was baby-sitting for the victim that morning and saw the victim leave with her some time before the victim's parents left to shop for a car. The defendant stated that he left the victim's home a minute or two later and had no contact with the victim. He also claimed, contrary to the detective's testimony, that, when confronted with the victim's accusations, he did not deny being at the home on August 31, 1985. He also testified that he did not know where the victim's brother was when the parents left and denied telling the detective that the brother was there the whole time. The defendant also testified that he knew of another man named "Benny" who was a neighbor of the victim's family and sometimes came to their home. He further testified that he lost his job at Amthor's Welding due to the arrest in this case and was replaced by the victim's uncle. The defendant denied that his employment at Amthor's Welding overlapped that of the victim's uncle. On rebuttal, the People called Ray Toombs, the foreman of Amthor's Welding, who testified that the defendant was not fired as a result of this arrest and was not replaced by the victim's uncle. In fact, the two men were simultaneously employed at Amthor's Welding.

In view of the long-term relationship between the defendant and the victim's family and the overwhelming evidence placing the defendant at the victim's house at about the time of the crime, the identity of the defendant as the perpetrator was amply proven. All the witnesses, including the defendant, agreed that the defendant had actually lived in the victim's household for a number of months only the year before. The theory that another "Benny" could have committed this crime was mere speculation. There is simply no reasonable possibility that the victim misidentified her attacker. The theory of fabrication is similarly far-fetched. The evidence demonstrated that it was unlikely that this nine-year-old child would concoct a story of this nature, nor was there indication of any motive (other than the claim that the defendant's arrest was used as an excuse to replace him at Amthor's Welding with the victim's uncle, which claim was disproven) of either the victim or any member of her family to falsely accuse the defendant. Thus, the jury was faced with determining whether to believe the victim, despite the minor inconsistencies discussed above, or the defendant, who was impeached by his prior felony conviction and whose testimony was contradicted by the detective and the rebuttal witness. The jury's determi-

nation was reasonable and not contrary to the weight of the evidence *(see, People v Ferrara,* 139 AD2d 842, 844-845; *People v Blair,* 137 AD2d 887, 888).

Alternately, the defendant seeks a new trial due to alleged prejudice caused by the testimony of Dr. Claire Fried, an expert witness called by the People, which testimony was stricken in its entirety by the trial court. Dr. Fried, a board-certified pediatrician with extensive training and experience in pediatric gynecology, testified that, although vaginal penetration could occur without subsequently observable dilation or tearing of the hymen, in her professional opinion the drawing by Dr. Oxley on the victim's medical records "indicates dilated hymenal opening and clear evidence of penetration". Dr. Fried further testified as follows:

"Q Doctor, this finding of enlarged, dilated, widened hymenal opening, is it common in sexually abused victims?

"A In fact, it's not common. * * *

"Q What if anything does that indicate to you? * * *

"A It indicates that the hymenal opening was dilated and that this was evidence of penetration.

"Q Would that penetration—what would have caused that penetration?

"A Many things could have caused the penetration".

On direct examination, the prosecution did not solicit and the witness did not offer an opinion as to whether the victim in this case had been sexually abused. However, on cross-examination, the defense attorney adduced the following testimony from Dr. Fried:

"Q Based on that hospital report can you tell us with medical certainty whether there was evidence of sexual abuse; yes or no?

"A By reading the entire record, including the patient's statement, yes I can say that.

"Q By reading that hospital record alone did you find sexual abuse?

"A Again, by reading the entire statement, including the patient's statement and the physician's drawing I would say yes there is medical evidence of sexual abuse.

"Q If you did not see the child's statement, just on the medical examination alone is there any evidence of sexual abuse?

"A There's a suspicion of sexual abuse, suspicion on the medical evidence alone, on the drawing alone."

Over the prosecutor's objection, the doctor further testified: "I read the whole hospital record which included the patient's statement and drawing which, I accepted to be accurate in terms of anatomy, going on that basis my statement is valid".

Obviously not content with these answers, the defense counsel persisted in this line of questioning of Dr. Fried, as follows:

"Q What I want to know is, what positive finding you found in reading the report that indicates that there was sexual abuse?

"A The drawing by the physician of the dilated hymen is positive finding.

"Q Of what?

"A Of penetration.

"Q Yes, fine. I agree to that, but does it mean there was sexual abuse?

"A Given the child's statement, yes, sir. * * *

"Q You mentioned items that would cause that. Does that mean that there was sexual abuse if there was—the hymen was open?

"A It means there was penetration.

"Q Penetration, but penetration does not mean sexual abuse, does it?

"A It does not only mean sexual abuse.

"Q Doctor, I'm going to—can you state with medical certainty, does penetration, if you have a finding of penetration, does that mean there's sexual abuse?

"A Not necessarily".

The next day, the defense counsel moved to strike the entire testimony of Dr. Fried on the grounds that there was an inadequate foundation for the expert opinion given and that Dr. Fried was "biased". The court did not accept those grounds but granted the motion to strike Dr. Fried's testimony on the ground that "the People attempted to impeach their own witness". The court thereafter twice instructed the jury to disregard Dr. Fried's testimony in its entirety.

It is not clear that Dr. Fried's opinion contradicted that of Dr. Oxley since he testified that he could not say whether or not the child had been sexually abused. However, it is unnecessary to resolve that question since we know of no rule of evidence either by statute or common law prohibiting a party from presenting divergent expert opinions on a particular subject *(see, People v Jackson,* 65 NY2d 265, 272, n 8). The testimony of Dr. Fried was not an attempt to impeach Dr.

Oxley's opinion but was a valid presentation of another, more qualified, clarifying medical opinion. Dr. Oxley's testimony was not in any way directly impeached in the manner recognized in the cases. As stated in *Remington Arms Co. v Cotton* (190 App Div 600, 610 [1st Dept]): "The law is well settled that a party may not impeach his own witnesses, although it be shown that such witnesses be prejudiced and interested. Nevertheless, a party may introduce evidence and swear witnesses to contradict any fact testified to by his witnesses where it appears that such testimony is not offered for the purpose of impeachment."

Moreover, while, ordinarily, a party may not impeach the credibility of its own witness *(see,* CPL 60.35; *People v De Martini,* 213 NY 203, 212-213), this rule does not prevent a party from proving a material fact by another witness even if the effect is to implicitly contradict its own witness *(see, Spampinato v A.B.C. Consol. Corp.,* 35 NY2d 283; *Quick v American Can Co.,* 205 NY 330; Richardson, Evidence § 508 [Prince 10th ed]; *cf., People v Reed,* 40 NY2d 204 [a prosecution witness was contradicted by the prosecution in almost every facet of her testimony]). One authority on the subject of New York evidence has explained this distinction as permitting contradiction of a party's own witness as to a material fact, as opposed to impeaching the general credibility of a party's own witness, which is prohibited *(see,* Mottla, New York Evidence §§ 441, 442 [2d ed]; *see also,* 3 Bender, New York Evidence § 143.03 [3] [a party may contradict its own witness "when the fact contradicted is material to the cause but not when it is material *only* to the witness' credibility"]). Thus, the prosecutor's presentation of the testimony of Dr. Fried was not reversible error.

On appeal, the defendant argues for the first time that to the extent that Dr. Fried's testimony referred to her reliance on the victim's statement in the hospital record as to the circumstances of the crime, it constituted impermissibly bolstering of the victim's testimony. Any issue of law with respect to the defendant's claim is not preserved for appellate review *(see,* CPL 470.05). In any event, no improper bolstering took place. Only when pressed by the defense counsel did the doctor offer her opinion that, based upon the physical evidence of penetration and the victim's statement in the hospital record, the child was sexually abused. The hospital record containing the child's statement was received into evidence and was a proper basis for the doctor's opinion *(see, e.g., People v Sugden,* 35 NY2d 453). The doctor did not state that she

believed the victim's account or express her opinion as to whether the jury should credit it. Thus, there was no "usurpation of the jury's prerogative and responsibility" to determine the question of the victim's credibility (see, People v Parks, 41 NY2d 36, 48; cf., People v Garcia, 75 AD2d 625).

We have considered the defendant's remaining claims and find them to be either unpreserved for appellate review or without merit. Thompson, J. P., Rubin, Spatt and Balletta, JJ., concur.