Fuchsberg, J.
The main question before us on this appeal is whether the prosecution in a criminal case may impeach its own witness by the use of his prior Grand Jury testimony when the witness, at trial, merely denies .any recollection of the events in question.
Defendant Frank Fitzpatrick was charged with the commission of perjury before a Grand Jury. An official of the steamfitters union, he was accused of accepting kickbacks from employers in the guise of salary checks made payable to nonemployees designated by him. Before the Grand Jury, Fitzpatrick had specifically denied ever having had in his possession or cashing any checks made out to one Hugh Mulligan by Afgo Corporation. The prosecution presented proof that, although Fitzpatrick had secured employment for Mulligan as a night watchman with Afgo, police surveillance indicated that not once had Mulligan appeared at Afgo during the 16 months he supposedly held the job.
Among the facts the prosecution sought to prove at trial were that, on the night of February 7, 1969, in Costello’s Bar on Third Avenue in Manhattan, Fitzpatrick had taken out of his pocket a check issued by Afgo, payable to Mulligan and indorsed by Mulligan, and had asked the bartender, one Frank Hanley, to cash it for him, that Hanley had done so, and that Fitzpatrick had pocketed the cash. There was no dispute that Fitzpatrick was in Costello’s that night or that he *47 had stood at the bar between Mulligan and an undercover police officer named Killeen or that a check made out to Mulligan and indorsed by him had been cashed there at that time. The question was whether this was done for Fitzpatrick himself or whether he had merely used his credit with the bartender to obtain a favor for Mulligan, who was not personally known at Costello’s. Killeen testified that Fitzpatrick had both taken the check out of his own pocket and retained the proceeds. Fitzpatrick testified that it was Mulligan who had put the check on the bar and picked up the cash.
Before Fitzpatrick’s indictment, Hanley had been called before the Grand Jury, where he was questioned by three Assistant District Attorneys. On being asked if he had cashed a check for Fitzpatrick on the night in question, he replied, "I probably did”. Asked "And you said to Fitzpatrick T will give you the money’?” he replied, "Yes”. The check in question had been made out in the amount of $199.35. The prosecutor asked Hanley, "He gave you sixty-five cents and you gave him an even two hundred dollars?” Hanley replied, "I don’t recall that, you know that better than I do”. At a later point in the hearing, in response to the question "On this occasion you gave Fitzpatrick the cash, am I correct?”, Hanley answered "Yes”.
Subsequent to his Grand Jury hearing and long before the trial, however, Hanley told one of the Assistant District Attorneys that he really could not recall the transaction in question, explaining that, at about the time of the check-cashing, he had been drinking heavily and had, in fact, lost his job for that reason shortly after the incident. He also informed the Assistant District Attorney that he had responded to the leading questions before the Grand Jury as he had because he thought that was what the District Attorney wanted him to do, because he assumed that there was independent proof that things had happened the way they were presented to him in the questions, and because he had been unable to cope with three interrogators at once. He went on to state that, in truth, he could not recall who had handed him the check or who picked up the money, and would not testify otherwise when the case went to court.
Despite this warning, the District Attorney put Hanley on the stand at the trial. When Hanley insisted that he could not recall the details of the check-cashing incident, the District Attorney asked for and received permission to treat Hanley as *48 an adverse witness and to impeach him by introducing his Grand Jury testimony as a prior contradictory statement. The substance of that testimony was read to the jury in open court; Hanley continued to state that he could not recall the facts. At one point, besides testifying that he actually could not now recall the facts of the check-cashing incident itself, he mistakenly asserted that he had so testified before the Grand Jury as well.
The jury having found Fitzpatrick guilty and the conviction having been affirmed by the Appellate Division, with two Judges dissenting, he now appeals to us, relying chiefly on the contentions that the testimony of Officer Killeen, who was the only witness against him, was not properly corroborated and that Hanley’s Grand Jury testimony should not have been admitted for impeachment purposes under CPL 60.35. For the reasons which follow, we hold that it was error to receive the Grand Jury testimony and that the conviction must be reversed.
New York is one of the few States in which the right to impeach one’s own witnesses in a criminal or civil trial by prior written or sworn statements is fully determined by statute rather than by case law (see CPL 60.35; CPLR 4514; Note, Prior Statements of One’s Own Witness to Counteract Surprise Testimony: Hearsay and Impeachment Under the "Damage” Test, 62 Yale LJ 650, 651-652, n 4). Applicable to criminal trials, the terms of CPL 60.35 are quite explicit:
"§ 60.35 Rules of evidence; impeachment of own witness by proof of prior contradictory statement.
"1. When, upon examination by the party who called him, a witness in a criminal proceeding gives testimony upon a material issue of the case which tends to disprove the position of such party, such party may introduce evidence that such witness has previously made either a written statement signed by him or an oral statement under oath contradictory to such testimony.
"2. Evidence concerning a prior contradictory statement introduced pursuant to subdivision one may be received only for the purpose of impeaching the credibility of the witness with respect to his testimony upon the subject, and does not constitute evidence in chief. Upon receiving such evidence at a jury trial, the court must so instruct the jury.
"3. When a witness has made a prior signed or sworn *49 statement contradictory to his testimony in a criminal proceeding upon a material issue of the case, but his testimony does not tend to disprove the position of the party who called him and elicited such testimony, evidence that the witness made such prior statement is not admissible, and such party may not use such prior statement for the purpose of refreshing the recollection of the witness in a manner that discloses its contents to the trier of the facts. ” (Emphasis added.)
This statute, enacted in 1970 (L 1970, ch 996), substantially changed prior law. Section 8-a of the Code of Criminal Procedure, CPL 60.35’s predecessor, authorized the use of a prior inconsistent statement for impeachment purposes whenever such statement was either signed or sworn. It is especially noteworthy that, in sharp contrast to the present statute, the code contained no provision that the statement must "tend to disprove the position” of the party seeking to use it. Nor did the code contain language comparable to that by which the use of such material to refresh the memory of a witness is now limited by CPL 60.35 (subd 3).
It is helpful to an understanding of the significance of the statutory change to note briefly how the principles of the law of impeachment have developed. The idea of prohibition of impeachment of one’s own witnesses descends to us from the ancient time when a party’s witnesses were brought into court not to swear to facts in a case but rather to a party’s own credibility. Not surprisingly, it then was considered ill befitting for a party to question the veracity of his own witnesses. However, with the passage of time, as our legal system developed into an adversarial one more concerned with the discovery of factual truth by means of impartial witnesses, the force behind' the prohibition was weakened, particularly in instances where a balkly witness could frustrate an entire case. To overcome such recalcitrance, circumventions of the strict rule came to be employed, one of the earliest being a resort to the rationale that a witness’ memory was being refreshed. Limited permission to impeach soon followed more openly (Note, Impeaching One’s Own Witness, 49 Va L Rev, 996, 996-999; cf. Bullard v Pearsall, 53 NY 230; People v Freeman, 9 NY2d 600, 603-604).
In the train of these developments, it soon became apparent that there were concomitant dangers in the use of out-of-court statements for impeachment of witnesses’ credibility. Despite judicial instructions advising juries that such material was to *50 go only to credibility, it was difficult to avoid having juries, when actually confronted with dramatically cogent impeaching evidence, treat it as though it were in fact direct evidence of guilt or innocence in criminal trials. At the very least, a real danger of confusion was omnipresent (see People v Freeman, supra; People v Ferraro, 293 NY 51).
There was, moreover, increased concern that the prosecution might misuse impeachment techniques to get before a jury material which could not otherwise be put in evidence because of its extrajudicial nature.[1] So, in People v Welch (16 AD2d 554, 556-557), a conviction was reversed because "The prosecutor under the guise of impeaching the witness (Code Crim. Pro., § 8-a) or refreshing his recollection proceeded to get before the jury all of the relevant contents of the affidavit made by the two witnesses and much that was irrelevant. This was done in the form of prefacing each question with the words 'Do you recall making this statement’ followed by a direct quotation from the statement. To each question the witness invariably stated in one form or another that he did not remember. * * * To cap all this it appears that the prosecutor knew that Lane doubtless would repudiate his sworn statement. ” (Emphasis added.)
It was to protect against just such abuse that there developed the requirement that, before a prior statement could be used to impeach one’s own witness, the in-court testimony of the witness had to be not merely inconsistent with the prior statement but damaging to the case of the party calling him as well (see Note, Impeaching One’s Own Witness, 49 Va L Rev 996, 1004-1009; Note, Prior Statements of One’s Own *51 Witness to Counteract Suprise Testimony: Hearsay and Impeachment under the "Damage” Test, 62 Yale LJ 650, 653, 658). Under this damage test, a balance is struck between the need "to 'correct the inequities occassioned by the fact that in many cases both sides were unfairly hampered by * * * inability to impeach unreliable witnesses upon whom they were compelled to rely’ ” (People v Freeman, 9 NY2d 600, 603, supra, quoting People v McCormick, 278 App Div 410, 413, affd 303 NY 403) and the need to ensure that material which has "no substantial or independent testimonial value” is excluded (at p 605, citing People v Kenda, 3 AD2d 80, 85 [emphasis by the Freeman court]).
It is this requirement that there be harm to the case of the party who called the witness before the risk of jury confusion may be undertaken which the Legislature codified in CPL 60.35 (subds 1, 2). Its intent is made additionally plain by the prohibition placed in 60.35 (subd 3) against the use of such material even for refreshing the witness’ recollection, a prohibition which also bars the traditional exception for material which is neither signed nor sworn and which otherwise may not be used to impeach (see People v Welch, 16 AD2d 554, supra; People v Freeman, 9 NY2d 600, supra; Bullard v Pearsall, 53 NY 230, supra). In brief, CPL 60.35 manifestly permits impeachment only when the testimony of the witness in court affirmatively damages the case of the party calling him.[2]
If additional confirmation of the purport of CPL 60.35 were needed, it is to be found in the fact that, though when former section 8-a of the Code of Criminal Procedure and section 243-a of the Civil Practice Act coexisted the requirements in civil and criminal cases were virtually identical, when CPL 60.35 was enacted, the language of section 243-a, though re-enacted *52 as CPLR 4514, was retained intact for civil trials. The damage requirement thus became peculiarly applicable to criminal cases. Indeed, were it not for the purpose of including the full-blown damage requirement, there would have been no need to pass new CPL 60.35 at all.
We must, therefore, ask whether the testimony of a witness who, as in this case, simply states that he cannot recall the events in question "tends to disprove” the prosecution’s case to such an extent that impeachment may be allowed. We think not. Hanley’s neutral testimony, in and of itself, merely failed to corroborate or bolster the prosecutor’s case; it did not contradict or disprove any testimony or other factual evidence presented by the prosecution here.
We are, of course, aware of the argument that harm to a party’s case may be psychological as well as direct. Thus, a jury, or a Trial Judge for that matter, might be set to wondering why the witness was called if his testimony is so noncommittal, a form of speculation from which experience teaches it cannot be clear which side, if any, will be the gainer. Or, if the tactics employed are heavy-handed enough, the impression might be left that the witness, and by implication a defendant against whom a prosecutor may have expected to turn the witness, is being harassed. And it is possible for a witness to be summoned to the stand with such heraldry and such an air of expectant triumph that his simple neutrality will suffice to leave an aura of failure for the one who called him. (See People v Le Beau, 39 Cal 2d 146, 149; Bassett v Crisp, 113 Cal App 2d 295, 306; People v Spinosa, 115 Cal App 2d 659, 667.)
But in the present case, we do not believe it necessary to consider whether the Legislature’s choice of the phrase "tends to disprove” can be construed to have such a broad reach as to encompass indirect psychological effects on a party’s case. For it is sufficient to note here that, where a party reliably is put on sufficient notice that the testimony of the witness involved may be expected to be noncommittal rather than consistent with his prior statement, the risk of psychological harm or help, as the case may be, has in effect, been assumed by the party calling the witness, if, having persisted in doing so in the face of the forewarning, it turns out that it was accurate (cf. People v Welch, 16 AD2d 554, supra). Such forewarning, in fact, not only provides the option to avoid the possibility of untoward consequences by not calling the witness, but also, if *53 he is called, makes it possible for sensitive counsel to deal with him in a manner that minimizes, if it does not entirely eliminate, any potential for peripheral damage.
The prosecutor in the case before us was amply warned by Hanley that his in-court testimony would be that he did not recall. To permit impeachment under such circumstances would be to allow a bootstrap procedure clearly transgressing any balancing of interests the Legislature could have had in mind even under a broad definition of "disprove”. It follows that Hanley’s out-of-court statement that Fitzpatrick not Mulligan, pocketed the proceeds of Mulligan’s check was inadmissible. And its use before the jury here was error of sufficient magnitude to require reversal since, without it, the case was a very close one, arraying Officer Killeen’s testimony and some few circumstantial facts on the prosecution’s side against Fitzpatrick’s testimony and that of his witnesses on the other (see People v Ferrara, 293 NY 51, supra). That it weighed the balance between guilt and innocence is further confirmed by the fact that during the jury’s deliberations its communications to the court were directed primarily to Hanley’s Grand Jury testimony.
The defendant has also challenged his conviction on the ground that there was insufficient corroboration of Officer Killeen’s testimony under section 210.50 of the Penal Law. We are obliged to consider that issue, despite our reversal on the ground that the Grand Jury testimony of the witness Hanley should not have been admitted, for a reversal on the basis of prejudicial error brings with it a new trial, while a reversal for insufficiency of the evidence requires dismissal of the indictment (CPL 470.20, subds 1, 2).
In this connection, it is relevant to point out that the check that was cashed bore, on its back, the words "Fitz steam T. Murray” in what Hanley acknowledged could be his handwriting. Fitzpatrick and Mulligan are both members of the steamfitters union; Thomas Murray is its president. Although well known at Costello’s, Murray was not in the bar on the night in question. Hanley testified that he did not recall writing the words; he admitted he could have written them either when he took the check or later that evening when he was tallying up the contents of the cash register. While it is possible, of course, that Hanley meant only to indicate Fitzpatrick’s sponsorship of Mulligan’s check, it is an at least more than equally permissible inference that the notations were made to help *54 him recall to whom he would have to turn if there was any trouble with the check. Had Mulligan himself been the presenter of the check and recipient of the cash ordinarily there would have been no need for Hanley to make a note to that effect, for Mulligan was already both payee and indorser. Furthermore, Fitzpatrick’s original inability to recall the details of his sponsorship of Mulligan’s check-cashing request before the Grand Jury contrasted with his far better recollection of that episode at trial.
In our view, these circumstances in combination as a matter of law were sufficiently "harmoni[ous] with [Killeen’s] narrative as to have a tendency to furnish the necessary connection between the defendant and the crime” (People v Dixon, 231 NY 111, 117; see, also, People v Morhouse, 21 NY2d 66, 74; People v Fellman, 35 NY2d 158; People v Daniels, 37 NY2d 624)[3] and mandates the submission of Killeen’s credibility visá-vis that of Fitzpatrick to the jury.
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

. A number of authorities have pointed out that the potential for prejudice in the out-of-court statements may be exaggerated in cases where the person making the statement is in court and available for cross-examination and, under such circumstances, favor their admission as evidence-in-chief. (See Note, Impeaching One’s Own Witness, 49 Va L Rev 996, 1008-1009; Note, Prior Statements of One’s Own Witness to Counteract Surprise Testimony: Hearsay and Impeachment Under the "Damage” Test, 62 Yale LJ 650, 658-661; 3A Wigmore, Evidence, § 1018; McCormick, The Turncoat Witness: Previous Statements as Substantive Evidence, 25 Tex L Rev 573; Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv L Rev 177; Di Carlo v United States, 6 F2d 364, cert den 268 US 706; United States v Freeman, 302 F2d 347, 351; cf. Letendre v Hartford Acc. & Ind. Co., 21 NY2d 518.) The objection that material intended to bear only on credibility might be utilized by the jury for more than that limited purpose would, of course, then be academic. We do not comment on these proposals other than to note them, since we are bound by GPL 60.35, the statute before us, which makes the admissibility of such material turn on criteria other than its hearsay nature.

. We note that Judge Denzer, in his Practice Commentary to CPL 60.35 (McKinney’s Cons Laws of NY, Book 11A, pp 252-254), equates the phrase " 'tends to disprove’ ” with the phrase "intrinsically unfavorable”. While it is true that both phrases were considered during the drafting of CPL 60.35, and the former ultimately was adopted over the latter (see Proposed New York Criminal Procedure Law, Preliminary Study Draft prepared by the Temporary Commission on Revision of the Penal Law and Criminal Code, § 30.50, pp 68-69, and the same commission’s report in 1969, § 60.35, pp 47-48), the choice of language does not appear to be dispositive of the case before us, since the issue here is not the extent or degree of harm to the prosecution’s case caused by Hanley’s failure to recall but, rather, whether the case was harmed at all by his neutral testimony. Indeed, the Practice Commentary’s choice of examples indicates that a witness’ failure to recall does not come within the concept of damage however it is defined.

. As we noted in People v Fellman (35 NY2d, at p 169), the test for corroboration under the rule set forth in section 210.50 of the Penal Law, applicable in perjury cases, is analogous to the test used in accomplice-witness cases.