Cooke, J.
In the early morning hours of January 8, 1972, John Banks was found dead in the Cloud Nine Bar, a single bullet wound in his chest. The angle of the bullet was slightly downward. A blood alcohol reading of .29 indicated that the deceased had been highly intoxicated. Banks’ body had been found a few feet from the serving bar and from his pocket the police recovered a straight razor wrapped in dollar bills. There was, however, disagreement between two of the officers who testified as to whether the razor had been found in Banks’ pants pocket or in that of his jacket.
The testimony provided a description of the Cloud Nine as having limited exits, locked doors and a guard dog making exit by any other than the front door difficult, if not impossible. A .25 caliber pistol was found in the backyard, approximately 15 feet from the rear of the premises, the only footprints in that vicinity being those of the officer who recovered the weapon. Once found, the pistol was carried, suspended on a pen, by the officer to his captain, the latter of whom in *206 removing the ammunition, took no care to preserve possible fingerprints.
Were it not for the testimony of the barmaid on duty, Claretta Mitchell Booker, there would have been no evidence connecting Mary Reed with the shooting and, in fact, no evidence connecting her with the premises in which the shooting occurred except for a pocketbook, the contents of which included a rent receipt in her name which was found upon a table top in the bar’s kitchen.
Claretta Mitchell Booker, when called as a witness by the People, described the events at the Cloud Nine Bar on the evening in question. She testified that at 9 o’clock she came on duty and that sometime thereafter Banks entered. Later, Banks who had seated himself near the middle of the serving bar moved closer to appellant, seated at the far end. The witness could hear Banks "cussing” and subsequently overheard part of a conversation between Banks and appellant where Banks said, "I will give you my own mess and you won’t hurt me.” To that appellant responded that she was not bothering Banks. The witness testified that she suggested appellant go downstairs where Banks would not bother her, and, after finishing her beer, appellant got up and, taking her belongings, started to walk to the rear of the premises, away from the front door, out of the witness’ view. The deceased also got up, razor in hand, and followed appellant. Appellant was heard to say, "Don’t cut me”. Banks took another step toward appellant and the witness heard a shot. Banks stepped back against the serving bar, razor still in hand, blood coming from his mouth. After falling to the floor, the razor remained beside him, still opened. The witness testified that after the shooting she saw the point of the gun in Mary Reed’s hand and that she and another barmaid, Evelyn Crawford, placed their hands upon those of Mary Reed, the latter saying, "He was going to cut me”. After the incident, Mary Reed left the Cloud Nine by the front door.
Apparently failing to give as detailed a description of what occurred as she had in a previous written statement, the prosecution requested that the witness be permitted to refresh her recollection by using such statement. Also, during the course of her testimony and for the reason that her trial testimony varied from that of the statement, the prosecutor requested that the witness be declared hostile so that leading questions could be asked. Both requests were granted. By the *207 use of leading questions, the jury learned that the witness in her statement had described Mary’s first words after the shooting and after the witness took hold of her hand as "Turn me loose or I will shoot.” Also, by way of leading questions, the witness was asked if she had told one of the investigating officers on the night of the shooting that she "suddenly heard a shot” and "saw Banks fall backward off the stool.” To this question the witness’ response was a definitive no.
While Claretta Mitchell Booker’s testimony implicated Mary Reed, it was also exculpatory for it provided a description of circumstances constituting a defense of justification, namely that Mary Reed, unable to escape Banks who was advancing and brandishing a razor, protected herself by firing a fatal shot in self-defense (Penal Law, § 35.15, subd 2, par [a]).
By jury verdict, Mary Reed was convicted of the crimes of manslaughter in the first degree and possession of a weapon, dangerous instrument and appliance as a felony. On appeal, in support of the conviction, the People argue that the physical evidence presented contradicted the barmaid’s testimonial evidence as to the manner of death and that, while their witness was credible when she testified that Mary Reed shot Banks, her testimony as to the manner in which the shooting occurred (e.g., that Banks brandished a razor) was contra-dieted by the physical evidence (e.g., that the razor was found on Banks’ person) and thus their witness was not to be believed.
There are certain exceptions to the rule that a party cannot ordinarily impeach the credibility of his own witness. In a criminal proceeding, when a witness gives material testimony which tends to disprove the position of the party who called said witness, such party may impeach that witness by proof of a prior contradictory statement (CPL 60.35, subd 1; cf. People v Fitzpatrick, 40 NY2d 44). Such statement may also be used for the purpose of refreshing recollection where the witness’ trial testimony, though disappointing or unhelpful, falls short of "disproving” the party’s position, so long as its contents are not disclosed to the trier of the facts (CPL 60.35, subd 3).
Although a party, to a certain extent, vouches for the credibility of a witness he or she puts on the stand, in civil cases, at least, it has been held that such party has the right to claim a witness mistaken and to contradict his or her witness, not for the purpose of impeachment, but to prove a material fact (Quick v American Can Co., 205 NY 330, 334). *208 While the credibility of a witness is ordinarily a question for the jury, and the jury may choose to believe some, but not all, of a witness’ testimony (Becker v Koch, 104 NY 394, 401; Title Guar. & Trust Co. v Pam, 232 NY 441, 454; see, also, Richardson, Evidence [10th ed], § 508), it is at the very least a questionable situation where a prosecution witness, put upon the stand to testify to the circumstances of a shooting, is contradicted by the prosecutor in almost every facet of her . testimony—save one. Thus, while the angle of the bullet, the spent shell found near the bar, and the razor found in a pocket all are said to contradict Ms. Booker’s testimony, the People have left unchallenged only her testimony that it was Mary Reed who held the gun and pulled the trigger.
This court has in the past and still continues in the present to review a record in a criminal action as a whole and is empowered and obliged to conclude on a deficient record that guilt has not been established beyond a reasonable doubt as a matter of law (see, e.g., People v Santos, 38 NY2d 173; People v Sickles, 35 NY2d 792, 793; People v Logue, 35 NY2d 658, 659; People v Collins, 31 NY2d 878, 879; People v Oyola, 6 NY2d 259, 261; see, generally, Cohen and Karger, Powers of the New York Court of Appeals, § 198, at pp 742-743).
So long as the burden is upon the People of not only removing the presumption of innocence, but of establishing the guilt of the accused beyond a reasonable doubt, a mere scintilla or even some proof is not sufficient to warrant the submission of the case to the jury (People v Ledwon, 153 NY 10, 18; People v Owens, 148 NY 648).
In People v Ledwon (153 NY 10, supra), the defendants, Joseph and Annie Ledwon, were indicted for the murder of Annie’s former husband whose dead body had been found "suspended by the neck with a rope from the crosspiece over the vault” in the water closet of his home. While suicide had originally been found to have been the cause of death, an indictment for murder followed. The testimony of the son of the deceased and Annie provided the only direct proof in the case that the death was other than suicide. Although the Trial Judge correctly characterized the son’s testimony as "involved in 'hopeless contradictions,’ ” he left it to the jury to find whether, on the whole, such testimony implicating the defendants, was worthy of belief (p 21). The Court of Appeals in reversing the conviction stated that "[gjuilt in such a case cannot be established beyond a reasonable doubt by the testi *209 mony of such a witness, who is, evidently, either from moral or mental defects, irresponsible” (p 22).
The case before us is remarkably similar to Ledwon, for the credibility of the only witness able to testify as to an essential element of the crime and, thus, supply the only proof of that element, is questioned, here, not by the defense or the court, but by the prosecution itself. No other witness could be found to testify that Mary Reed was in the bar on that evening or that Mary Reed shot Banks, although there were others in the bar that night including Evelyn Crawford, the off-duty barmaid, who played a part in Claretta Mitchell Booker’s narrative. No circumstantial proof, no fingerprints or proof of ownership of the weapon was presented to add credence to what in all other respects, we are told, is an unbelievable story.
The burden was upon the People to prove guilt beyond a reasonable doubt (CPL 70.20) and to disprove the justification defense by like degree (Penal Law, § 25.00, subd 1). In this case, in the process of attempting to do the latter, the People failed to accomplish the former. Accordingly, there must be a reversal and a dismissal of the indictment.
While not determinative here, it is quite significant that Mary Reed, though a genuine victim of amnesia, was not permitted to put that fact before the jury. Appellant’s counsel in his opening statement indicated that by cross-examination of prosecution witnesses appellant would present a defense of self-defense and her only offer of proof would be "psychiatric medical proof to show that the defendant is * * * suffering from an amnesia, a true lack of memory of the entire incident”. Dr. Eva Rado, Chief of Forensic Psychiatry at Grasslands Hospital, was called to the stand as the only defense witness, but was not permitted to testify to her examination of appellant, appellant’s condition or to appellant’s medical history, which, it appears, included a history of amnesia predating the crime and stemming from a 1965 car accident. The court, accepting the prosecution’s objection that a proper foundation had not been laid, would have required appellant to take the stand before it would have permitted the doctor to continue. This was error, for no such foundation was necessary. A defendant should not be required to waive her constitutional privilege against self incrimination in order to place before the jury a fact relevant to her case. Here, the doctor’s testimony would have put the fact of defendant’s amnesia into *210 evidence and would have served as an explanation of why defendant did not take the stand, an explanation the jury never received and which, in the context of this case, was expected (cf. People v Francabandera, 33 NY2d 429, where the issue was not whether the fact of the defendant’s amnesia could be introduced into evidence, but, rather, whether such amnesia made the defendant an "incapacitated person” and therefore unfit to proceed to trial). While such trial error, of itself, would have required a reversal and new trial, here, the prosecution failed to prove its case beyond a reasonable doubt, as a matter of law, and thus the judgment of conviction should be reversed and the indictment dismissed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
Order reversed, etc.