THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAIK DAHIR HAGI, Appellant.

First Department, June 27, 1991

APPEARANCES OF COUNSEL

*Richard Joselson* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Deborah L. Morse* of counsel *(Norman Barclay* and *Beth J. Thomas* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

Defendant was convicted, after a jury trial, of attempted murder in the second degree as a result of a stabbing that occurred in the aftermath of an argument between friends outside a social club.

The People's evidence showed that on the evening of July 26, 1988 Osman Nur Hussein, who, earlier that day, had been drinking in Morningside Park with fellow Somalians, defendant Maik Dahir Hagi and Hassan Mohammed Ali, left a social club frequented by Somalians at 148 Street and St. Nicholas Avenue and found defendant yelling and cursing at Ali outside of the Somali social club next door, to which the latter two had repaired several hours earlier after they left

the park. Khaire Abdillah, a Somali-born 22 year old, was also standing outside the club next door, as was Adawi Mohammed.

Hussein walked over to the group and asked what had happened. Defendant responded by cursing at Hussein and telling him, "It's none of your business. Get out of my way." When Hussein took umbrage at these remarks, defendant said that he would "cut" him and, to prove the point, reached into his pocket and pulled out a knife. Ali, who had not, at least until then, been paying attention to the exchange, noticed that Hussein was empty-handed.

Wielding the knife, which had a three- or four-inch blade, defendant came at Hussein, who stepped back and, using a "karate-type" kick, tried to knock the knife away. When defendant moved his hand, thereby avoiding the kick, Hussein turned and headed toward a nearby subway entrance. His walk turned to a run, however, when he heard shouted warnings that defendant was following him with the knife. Defendant, knife in hand, caught up with Hussein and chased him around a trash can, shouting, "I'm going to kill you." Retreating, Hussein picked up the trash can and threw it, hitting defendant in the head and knocking him to the ground. The force of the blow caused the blade of the knife to cut into defendant's hand.

Thinking that defendant was unconscious, Hussein left, walking in the direction of the subway entrance. Again he heard shouting, warning him of defendant's approach. Hussein tried to run; defendant, however, was right behind him. Hussein turned and, as he did so, slipped and fell. As he was falling, defendant stabbed him on the left side of the abdomen, about 2 or 3 inches above the waist. Hussein could feel the knife go "all the way in". Defendant kneeled over him and stabbed him again, on the left side of his chest just under the nipple. As Hussein struggled to free himself, defendant stabbed him two more times. When Hussein pleaded with him to stop, defendant responded, "I don't care, I'm going to kill you."

Hussein eventually succeeded in pushing defendant off of him and was helped by a bystander into the subway station as defendant, bleeding, but no longer holding the knife, ran off. Before departing by ambulance for the hospital, Hussein told a detective that "Adam" had "cut" him in a "fight". Defendant was arrested later that evening. Although the area

around the subway station was searched, the knife used in the incident was never recovered.

Hussein sustained two three-centimeter wounds, one located between the ribs, the other on the left side of his abdomen just below the navel. With respect to the former, the knife penetrated the lung and punctured the diaphragm, causing extensive bleeding into the abdominal cavity. Surgery was required.

Several weeks before trial, after Ali had testified at a pretrial hearing, he met defendant, who accused him of being "a witness against [him]". Defendant told Ali, "[S]ee what I'm going to do to you; this is going to be over very soon." Thereafter, whenever defendant saw Ali, he repeated the threat.

Defendant, known to his friends as Adam, testified that he spent the evening of July 26, 1988 with Hussein at a Somali social club eating, drinking and talking. Around 8:30 or 9:00 P.M., they were joined by Ali, who, at some point, told Hussein that it was defendant who had been spreading the "story" that, one week earlier, he and Hussein had taken money from Mohammed Shech, who was drunk and asleep on a park bench. Hearing this, Hussein threatened to kill defendant. Defendant, Hussein and Ali were then asked by the club owner to leave. Outside, some Somalians warned defendant that Hussein was a killer.

As defendant walked away, Adawi yelled, "watch out". Defendant turned and saw Hussein throwing a trash can at him. After being struck and knocked to the ground, defendant got up and ran. Hussein, now holding a knife, renewed the chase. As Hussein approached, defendant reached out and "caught the blade", cutting his hand. The two men struggled over the knife and fell to the ground. As they "roll[ed] several times in the fall," Hussein was pushing the knife toward defendant, who, in turn, was pushing the knife toward Hussein. Defendant did not stab Hussein, although he believed the knife went into Hussein's body twice after they both had fallen. At the approach of a police officer, Hussein, who had the knife, ran away. Defendant denied ever speaking to Ali after July 26th.

Defendant does not challenge the sufficiency of the People's proof, which we find strong and persuasive. Hussein's account of defendant's attack, credible and consistent, was sufficient by itself to sustain the jury's finding that defendant

had stabbed him, intending to kill. In addition, Khaire Abdillah, who had never seen either defendant or Hussein before this incident, testified that he had been standing in front of the social club when defendant took a knife out of his pocket, held it at his side and walked toward Hussein. Abdillah also confirmed that Hussein, before being stabbed several times, attempted to fend off defendant's attack by trying to kick the knife away and then knocking defendant to the ground with a trash can. Ali further corroborated Hussein's testimony. Finally, the medical testimony with respect to the depth and severity of Hussein's wounds provided graphic evidence of defendant's intent to kill. While the People's witness, Yussef Mohammed, offered a somewhat different version, testifying that Hussein first threatened to kill defendant during an argument in the social club and that defendant was not holding a knife when Hussein threw the trash can at him, this evidence did not impugn the force of the People's proof. Mohammed admitted that he had not seen the stabbing. More importantly, given his admission that he had feared defendant in the past and had previously obtained an order of protection after defendant had threatened him with a knife, the jury had good reason to question his account. On the question of a threat, the jury also heard Officer Torres testify that, during the trial, he had seen defendant and Mohammed standing together and talking near the witnesses' room.

Although defendant does not question the sufficiency of the People's proof, he does challenge the adequacy of the court's charge, claiming it undermined his justification defense by failing to instruct the jury that the reasonableness of his conduct must be assessed in light of his individual circumstances and situation. Defendant also complains that the prosecutor's conduct deprived him of a fair trial. We find his claims to be lacking in merit and, in some instances, unpreserved as a matter of law and, accordingly, affirm.

At trial, defendant submitted a proposed charge on the defense of justification which would have asked the jurors to determine whether, "in light of all the circumstances," he was reasonable in his belief that deadly physical force was necessary. As requested, the charge would explain that these "circumstances" included "any relevant knowledge the defendant, Maik Hagi, had about [Hussein]," "the physical attributes of [the] persons involved, including the defendant, Maik Hagi" and "any prior experiences [defendant] had which could provide a reasonable basis for a belief that Osman Hussein's

intentions were to injure or rob him or that the use of deadly force was necessary under the circumstances." Although the court did instruct the jury on the defense of justification, it declined to give the requested charge. Defendant excepted, arguing that the court's charge failed to specify "all the factors, circumstances and experience" that the jury should consider in determining the reasonableness of his belief that he was in imminent danger.

■ It is now well settled that the defense of justification contains a subjective as well as objective component. *(People v Goetz,* 68 NY2d 96, 112-115; *People v Wesley,* 76 NY2d 555, 559.)* Under Penal Law § 35.15 (2) (a), a person is justified in using deadly force against another if he or she "reasonably believes" that the other person is about to use such force against him. Thus, the jury must engage in a two-step analysis. It must first determine whether the defendant actually believed that his life was in imminent danger *(People v Goetz, supra,* at 113) and then ascertain whether the defendant's perceptions concerning the need for the use of such force were reasonable *(supra,* at 114-115). It is clear, however, that a jury's "reasonableness" exploration is not purely an objective one. The determination of the "reasonableness" of a defendant's belief must be based on the "circumstances" facing the defendant or his "situation" *(supra,* at 114; *People v Wesley, supra,* at 559). These circumstances, which are not limited to the physical movements of the defendant and complainant during the altercation, involve a host of subjective factors, including any relevant knowledge that the defendant has concerning the complainant *(supra; People v Goetz, supra,* at 114), the physical attributes of the defendant and the complainant, the complainant's reputation for violence or assaultive behavior and any specific prior acts of violence on his part, if known to the defendant *(People v Goetz, supra,* at 113-114). We find, defendant's claims notwithstanding, that the trial court's charge directed the jurors to apply the proper standard to the facts of this case.

■ In explaining the defense of justification, the court instructed the jurors, pursuant to Penal Law § 35.15, that "a person may * * * use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself * * * from what he reasonably believes to be the use [or] imminent use of unlawful physical force by such other person". Later, the court told the jury that, in determining the reasonableness of defendant's belief,

"it is important for you to remember that reasonableness is not based upon what you or the defendant should have done under the circumstances. The basic test for reasonableness is what an ordinary prudent man would have done under the circumstances. The same is true with the degree of force used. The test is what amount of force a reasonably prudent man would have exerted under the circumstances of this case as you find them to be." Thus, in directing the jury to consider "the circumstances of this case as you find them to be", the court clearly directed the jurors to take into account defendant's particular circumstances.

Given the paucity of evidence as to defendant's knowledge of Hussein, the court was not obliged to elaborate any further. Virtually nonexistent, the evidence on this point was limited to the fact that Hussein was taller and heavier than defendant, a circumstance which the jury could obviously observe for itself, and that when, according to defendant, he, Hussein and Ali were asked to leave the social club, other Somalians warned defendant that Hussein was a killer. There is no evidence that defendant knew that Hussein was karate trained so that even this factor, which defendant cites, is of no relevance. Thus, there was no need to recount these limited circumstances, so straightforward and so obviously relevant to the reasonableness of defendant's belief that he was in imminent danger. A juror would surely appreciate that the "ordinary person" would feel a greater threat from a physically bigger person or one described as a killer. A juror would not need a detailed instruction to remind them about such "subjective factors" or to assess properly their significance.

More significantly, however, further elaboration about the "subjective" factors listed in defendant's proposed charge would, in any event, have been unnecessary in this case since these factors could not reasonably have played any role in the jurors' assessment of the evidence. According to defendant, Hussein, after threatening to kill him, struck him with a trash can and, wielding a knife, chased him. This testimony, if credited, would have, even under a standard wholly objective, justified the use of deadly physical force since it is certainly objectively reasonable to believe that a knife-wielder who threatens to kill poses an imminent threat of unlawful physical force. Under such circumstances, what defendant knew about Hussein, had there even been anything to speak of, would have been utterly beside the point; if the jury credited defendant's version, it had no need to resort to any "subjec-

tive" factors in order to justify his conduct. Nor was there anything in the People's presentation of the case, upon which the jury could fasten its attention, suggesting any relevant subjective factors justifying defendant's conduct. Thus, reminding the jurors about defendant's prior relationship with Hussein or his physical attributes could not reasonably have affected the outcome of the case.

■ Indeed, in light of defendant's trial position, such a charge would have been out of place since, as noted, he categorically denied stabbing Hussein at all; rather, he maintained that after threatening to kill him, Hussein had hit him with a trash can, chased him with a knife and then gotten "cut" accidentally during a struggle over the knife. Significantly, in his summation, defendant's attorney made only a passing reference to the defense of justification and then only as a preface to his remarks about the People's burden of proof and the reasonable doubt standard. Under such circumstances, any detailed discussion of the subjective aspect of the justification defense, even if warranted, would have been surplusage. The function of a charge is to correlate applicable legal principles to a body of evidence for the guidance of a jury, not to intone abstract legal propositions. Thus, we conclude that the court's charge adequately conveyed the requisite principles of the justification defense.

Of the variety of complaints about the prosecutor's trial conduct, most have not been preserved for appellate review and, in any event, none warrants reversal. During his direct examination, the People's witness, Yussef Mohammed, testified that although he had seen Hussein throw a trash can at defendant he had not seen a knife in defendant's hand at the time. Even though he was not "afraid" of defendant at the time of trial, Mohammed had previously obtained an order of protection after defendant had brandished a knife and threatened to kill him during a "fight", which, he insisted, had nothing to do with his testimony in this case but rather with "ethnic" differences. After Mohammed so testified, the prosecutor asked him about statements he had made prior to trial during separate conversations with the prosecutor and a police detective, specifically, whether he had said that defendant was holding a knife during the encounter with Hussein and that on a subsequent occasion defendant had brandished a knife and threatened to kill him because of his testimony in this case. Mohammed denied making such statements.

■ By questioning him in this manner, defendant argues,

the prosecutor improperly impeached his own witness in violation of CPL 60.35 (1), which limits such impeachment to a prior contradictory statement, either written and signed by the witness or made under oath, and confines its use to instances where the witness, on a material issue, gives testimony tending to disprove the position of the party who called him or affirmatively damages that party's case. *(See, People v Fitzpatrick,* 40 NY2d 44, 51.) Here, none of the prior conversations alluded to were made under oath. Nor, defendant argues, were the conversations relating to defendant's threats against Mohammed material to the People's case. Defendant also claims that by her manner of questioning, the prosecutor became an unsworn witness against him. It should be noted, however, that, although defendant complained about the prosecutor's use of leading questions without a declaration that Mohammed was a "hostile" witness, he never objected on any of the grounds now asserted. Thus, none of these claims are preserved for appellate review as a matter of law. (CPL 470.05 [2].)

In any event, while the prosecutor clearly proceeded in violation of the statute since the alleged inconsistent statements were neither in a writing signed by Mohammed nor made under oath, none of the questioning of which defendant now complains could have adversely affected the outcome. Mohammed was steadfast in his denial of having previously seen defendant holding a knife during the altercation. Any statement he might have made to the contrary effect, he explained, was the result of a mistake in translation by the interpreter. As for the evidence of a threat, the jury had already heard Hassan Ali recount his own experience with defendant in that regard. Ali had testified that defendant had threatened him numerous times about offering testimony in this case. In any event, the court instructed the jury that the evidence consisted of the testimony of the witnesses and any exhibits in evidence, not the "remarks" of counsel. In light of such an instruction, which the jury is presumed to follow *(see, People v Davis,* 58 NY2d 1102, 1104), it is not likely that the jurors treated any of the questions themselves as proof of defendant's guilt.

Moreover, the prior statements disclosed by these questions were of little or no consequence since three other witnesses placed the knife in defendant's hand at the time of the incident. Khaire Abdillah, the disinterested bystander, saw defendant use the knife to stab Hussein. Hassan Ali testified

that he saw defendant brandish the knife at Hussein, who himself testified in detail as to how defendant had used the knife to stab him. In light of such strong evidence of guilt, the jurors would have had no need to look to any prior statements by Mohammed for proof that defendant was the knife-wielder. Thus, any error in this regard was harmless. *(See, People v Saez,* 69 NY2d 802, 804.)

Defendant also alleges that through blatantly improper arguments and by eliciting examples of uncharged prior criminal conduct, the prosecutor repeatedly suggested that he had a propensity toward violence. "As a general rule, evidence of prior, uncharged criminal conduct may not be admitted as part of the People's direct case if its only purpose is to establish the accused's propensity to engage in criminal activities". *(People v Santarelli,* 49 NY2d 241, 247.) Where, however, such evidence "has a bearing upon a material aspect of the People's case other than the accused's general propensity toward criminality * * * the probative value of the evidence justifies its admission, notwithstanding the potential for incidental prejudice" *(supra,* at 247). Review of the record reveals that defendant's arguments are without merit.

Defendant argues that the prosecutor's pattern of misconduct began when, in her opening statement, she characterized him as "a man * * * who has a temper and * * * absolutely no hesitation about threatening people, terrorizing people and whipping out a knife whenever his bad temper is getting the best of him and whenever things aren't going his way." This statement followed a brief and matter-of-fact narrative of the incident as well as description of the victim's injuries and was prefaced with the remark that Hussein was "the victim of a completely * * * unprovoked and senseless attack". In that same context, the jury was also told, "I don't think you're going to understand every aspect of this case, in fact I don't think you're going to understand ever why this defendant did what he did, but there are certain things in life that just can't be explained". Thus, it seems fairly obvious that the prosecutor was attempting to offer a rationale for defendant's otherwise inexplicable behavior. That the statement was so understood is best illustrated by defendant's failure to object to it in any manner whatsoever. To the extent, however, that the prosecutor failed to limit the explanation to the particular incident and generalized defendant's conduct, she exceeded the bounds of propriety. *(See, People v Pinkas,* 156 AD2d 485, 487, *lv denied* 75 NY2d 816.) Given the nature of the proof

and the unlikelihood that this remark had any effect on the verdict, we decline to exercise our interest of justice jurisdiction *(see,* CPL 470.15 [3] [c]) to reach this unpreserved error. Several witnesses, including a bystander with no previous connection to either participant, described how defendant had provoked a fight with Hussein and then, single-mindedly, pursued him until he stabbed him several times. If they credited this evidence, any propensity argument would be superfluous. Nor does this error when viewed cumulatively with any other error warrant reversal or indicate a persistent pattern of prosecutorial conduct, as alleged. Although this may not have been a perfect trial, review of the record leads us to conclude that it was a fair one.

█ Defendant complains that the prosecutor improperly elicited from Ali that two months before the incident he had seen defendant with a knife that looked like the one used in this crime. Evidence tending to show that defendant had displayed the same knife on an earlier occasion was, however, as the People contend, relevant to rebut defendant's claim, reflected in both his opening statement and testimony, that it was Hussein, not he, who brandished the knife during the encounter. Equally unpersuasive is defendant's complaint about Ali's testimony that defendant had threatened him immediately after he testified against defendant at a pretrial hearing in this case and on a number of subsequent occasions. Contrary to defendant's claim, Ali never testified that defendant displayed a knife or indeed any weapon on these occasions. In fact, he specifically denied any such display. And, of course, this evidence was properly admitted since a defendant's attempt to intimidate a potential witness against him demonstrates a consciousness of guilt. *(See, People v Reyes,* 162 AD2d 357, *lv denied* 76 NY2d 896.)

█ Defendant also complains that, during the prosecutor's cross-examination of him, she elicited that he had entered the country illegally, used an alias in doing so and had been fired from his job as a janitor because of a fight with a fellow employee. A defendant who chooses to testify may be cross-examined with respect to "any immoral, vicious or criminal acts [in] his life which have a bearing on his credibility". *(People v Greer,* 42 NY2d 170, 176.) Here, given the strikingly contrasting versions of the incident, the issue of credibility was pivotal in the jury's evaluation of the evidence.

Notwithstanding, defendant argues that he should not have been questioned on the reasons for the loss of his janitor's job

because the particular questions suggested a propensity for violence. Specifically, defendant complains that the questions portrayed the incident for which he had been fired as an unprovoked assault on an old man. At trial, however, he did not, as was his burden, seek to preclude the questioning on this ground. *(See, People v Sandoval, 34 NY2d 371, 378.)* Moreover, defendant ignores his steadfast denial of any wrongdoing in connection with that incident and insistence that he punched the other employee only after the employee had first struck him and called him by a racially offensive name. While, at one point during the exchange, the prosecutor asked defendant, after he acknowledged that he had acted in self-defense, whether the co-worker "[had] any knife in his hand", the question does not, as is argued, suggest propensity but, rather, albeit sarcastically, disbelief at defendant's explanation. This is, of course, a permissible cross-examination technique. Nor did the question carry any suggestion, as is now claimed for the first time, that defendant has "escaped punishment for similar acts in the past." *(See, e.g., People v Cavallerio, 71 AD2d 338.)* It should also be noted that defendant failed to object to the question.

■ Equally unavailing is defendant's claim that the prosecutor shifted the burden of proof during summation by asking the jury to "wonder" about Adawi's absence. According to defendant, Adawi had witnessed the incident and had warned him of Hussein's unprovoked approach with the trash can. Thus, Adawi could be expected to have corroborated defendant's account; and, there was evidence that he was both available and under defendant's control. *(See, People v Lopez, 165 AD2d 773, lv denied, 77 NY2d 879.)* Defendant testified that he had seen Adawi, who lived near the Somali social club, in the club a number of times after the incident. Hussein testified that Adawi and defendant were related "tribally". Thus, since a missing witness charge with respect to Adawi would have been entirely appropriate, the prosecutor acted within the legitimate bounds of advocacy by urging them to draw a negative inference from his absence. In any event, the court's detailed instructions with respect to the People's burden of proof eliminated any possibility of jury confusion on the subject. *(See, e.g., People v Fox, 72 AD2d 146, 147.)* Significantly, the court emphasized that the burden of proof remained with the People throughout the trial and "never shifts to the defendant".

■ Nor did the prosecutor go outside the record when, in

summation, she argued that defendant had "reached" Yussef Mohammed, the People's witness, whose testimony corroborated defendant's account more than it did Hussein's and who admitted that defendant had previously threatened him and had been seen by Officer Torres talking to defendant during the trial. Thus, the suggestion that Mohammed's testimony was induced by intimidation was well grounded in the record and constituted fair comment. Again, it should be noted, this claim is unpreserved.

Defendant also claims that the prosecutor impinged on his Fifth Amendment rights by commenting in summation that the reason why defendant never told the police officer who summoned an ambulance for him or the ambulance attendant that Hussein had tried to stab him with a knife was because he had not "made up" that "defense" until "later". Where, however, a defendant chooses to forego his right to remain silent and instead voluntarily makes a statement about the crime, any significant omission from that statement may be used for impeachment purposes. (See, People v Savage, 50 NY2d 673, 678-679, cert denied 449 US 1016.) Defendant testified that he told both the police officer and the ambulance attendant that he had been hit in the head with a trash can. In light of defendant's failure to mention that he had been cut by a knife, information which would have been relevant to the medical treatment of his hand wound, the prosecutor could appropriately refer to that omission and urge that it cast doubt on the veracity of defendant's testimony that he had, in fact, been cut on the hand by Hussein. In any event, the issue is one of relevancy, not constitutionality. (See, People v Conyers, 52 NY2d 454.) Even if the prosecutor's brief remarks on the subject were irrelevant, they could not have had any substantial effect on the outcome of the case.

We have examined defendant's other contentions and find that they are without merit.

Accordingly, the judgment of the Supreme Court, New York County (Clifford A. Scott, J.), rendered June 26, 1989, convicting defendant of attempted murder in the second degree and sentencing him to an indeterminate term of imprisonment of from 7 to 24 years, should be affirmed.

ROSENBERGER, KUPFERMAN, ASCH and KASSAL, JJ., concur.

Judgment, Supreme Court, New York County, rendered on June 26, 1989, unanimously affirmed.