OPINION OF THE COURT
Bellacosa, J.
Defendant appeals, by leave of a Judge of this Court, from an order of the Appellate Division affirming his conviction for murder after a jury trial. The reading of the Grand Jury testimony of teen-age witness Gonzalez to the petit jury under extremely prejudicial and improper circumstances constituted reversible error. The prosecution adduced "testimony” evincing only Gonzalez’s refusal to implicate defendant in the crime in order to indirectly present to the jury otherwise unusable, highly inculpatory evidence. The resulting prejudice *176 in the context of the staging and presentation of testimonial evidence before the petit jury exceeds tolerable limits.
Because the admission of Gonzalez’s Grand Jury testimony engendered serious prejudice which was exacerbated by the manner in which the trial and “testimony” proceeded with respect to the other teen-age witness, Lawrence, we hold that the trial court erred in admitting Gonzalez’s Grand Jury testimony. We thus reverse the order of the Appellate Division and grant a new trial.
Defendant Russ and a codefendant, not before us, were accused of shooting and killing Hector Rodriguez in the course of a mugging in the hallway of a housing project in Brooklyn in June 1984. Nearly a year later, a police officer met Gonzalez and Lawrence at the local precinct where they had gone to visit a friend on an unrelated matter. Gonzalez and Lawrence and their families lived in that same housing project where the defendants also lived with their families. The victim also lived in the projects. The officer, who knew the two teen-agers, questioned them in connection with the open investigation of the Rodriguez slaying. He eventually secured their cooperation and, under subpoena before the Grand Jury, they testified and implicated defendant. However, the witnesses recanted 10 months later to a defense investigator in written statements indicating they did not see who shot Rodriguez. Shortly before trial, Gonzalez made a statement in the District Attorney’s office confirming her Grand Jury testimony. Material witness orders were issued for Lawrence and Gonzalez.
When the prosecutor called Lawrence to testify on the first day of trial, she testified that she and Gonzalez saw only the victim on the night of the shooting, and she did not see defendant or the shooting. The prosecutor then impeached Lawrence by reading her entire Grand Jury testimony into evidence. The second day on the stand, Lawrence, after being assigned counsel, invoked her 5th Amendment rights. Since she, like her friend Gonzalez who was scheduled to testify next, had fully recanted prior to and at trial and did not incriminate defendant on the stand at the trial, the prosecution interrupted Lawrence’s midafternoon testimony and obtained a continuance. Lawrence, then 17 years old, was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and frightened to the District Attorney’s office; (4) interrogated and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until *177 5:00 a.m. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 a.m. where she was kept in handcuffs except for her time on the stand. Lawrence’s postarrest and postincarceration testimony, tending to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody.
After intermittent pretrial sparring between the People and the next witness, Gonzalez, she was called to the witness stand and also invoked the Fifth Amendment with the advice of counsel, outside the presence of the jury. After the court conferred immunity on Gonzalez — except for perjury — she testified outside the jury’s presence and made it unquestionably clear and certain that she did not see defendant in the hallway the night of the shooting and would not give substantive testimony against him at the trial. Before being called to the stand, witness Gonzalez was also made aware of the coercive conduct visited on her companion and cowitness, Lawrence. Faced with Gonzalez’s determined decision not to cooperate and her predictable refusal to give testimony, the People nevertheless, over objection, called Gonzalez to the stand with their no-lose, fail-back strategy of at least presenting her Grand Jury testimony against defendant to the petit jury for the purported purpose of attacking her credibility. The People contend, in effect, that hope springs eternal and that their objective — despite Gonzalez’s unequivocal and undeviating representations and the peculiar circumstances of this case — was to secure her direct evidence testimony implicating defendant. The People, not surprisingly, failed in their purported purpose as to this witness — Gonzalez did not directly implicate defendant in the charged crime in her "testimony” —yet the People succeeded in the bottom-line goal. They now claim that the ensuing limiting instruction, warning the jury against considering the damning Grand Jury testimony as evidence-in-chief, cured any infirmities or concerns about their tactics (see, CPL 60.35; People v Fitzpatrick, 40 NY2d 44). We disagree.
However, before turning to our dispositional analysis, «we note that the sum total of Lawrence’s coerced eventual testimony barely and circumstantially inculpated defendant. To be precise, Lawrence’s direct testimony after her midtrial arrest and incarceration offered some evidence that defendant was seen with his codefendant searching the mugged victim’s pockets. Both Lawrence and Gonzalez insisted throughout *178 trial that they never saw a shooting. They explicitly denied seeing either defendant participate in any killing or shooting. Because there is sufficient circumstantial evidence under the standard of review that pertains in our Court, the People’s case survives traditional insufficiency of evidence analysis (see, People v Contes, 60 NY2d 620). Dismissal of the indictment is therefore not warranted or an appropriate corrective action (contrast, People v Reed, 40 NY2d 204; People v Ledwon, 153 NY 10).
However, in the context and circumstances of this case, the flagrant use of Gonzalez’s Grand Jury testimony at trial transgressed the line drawn in People v Fitzpatrick (40 NY2d 44, 52-53, supra). The People rationalize and characterize as unfortunate or undesirable the circumstances as they bear especially on the prejudicial use of Grand Jury testimony in the context of the key issues of this trial. The use of Grand Jury testimony in this manner was not made in good faith as required, but rather to circumvent the evidentiary rule protection against otherwise inadmissible evidence.
The People urge us to slot the treatment of witness Lawrence insofar as it bears on the over-all context and prejudice into a mere credibility contretemps — on the basis of which it is suggested that this Court need not be unduly concerned or interfere because the jury, aware of all the permutations, would somehow do the right thing. The argument is unavailing. Some egregious circumstances plainly do not justify such deference (see, Jackson v Denno, 378 US 368; People v Huntley, 15 NY2d 72, 78; see also, Lego v Twomey, 404 US 477, 484-485; LaFrance v Bohlinger, 499 F2d 29, 32-35, cert denied sub nom. LaFrance v Meachum, 419 US 1080; see also, Rochin v California, 342 US 165, 172; United States v Archer, 486 F2d 670 [Friendly, J.]). These last cited cases illustrate situations, such as were employed especially against witness Lawrence to "legally” coerce her testimony, in which relying on the ultimate discernment and virtue of the jury is not adequate. Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to the maintenance of the integrity of the criminal justice process.
The collective sum of egregious features of this case bears contextually on the seriously prejudicial Grand Jury testimony of Gonzalez. Since we are unanimous that the prosecutor’s trial tactics are unacceptable, this Court has a serious *179 obligation to explain its views in the context of relevant record material, not in some conclusory fashion. This serves the purpose of articulating the reasons for the judgment in the particular case and of reflecting our expectation that future cases will not suffer recurrence of such evidentiary detours and prejudicial tactics (compare, People v Smith, 168 AD2d 653, lv denied 77 NY2d 967). We also note that the prosecutorial actions of this case are not to be confused with material witness procedures, which are very different in kind and degree from what happened in the trial of this matter (see, CPL art 620). Nor may we give any credence or pause to the totally untenable claim of the People that they were acting in order to avoid a missing witness charge.
Had the reactive prosecutorial dissatisfaction with these two witnesses — teen-age civilians and innocent bystander witnesses — been directed at an accused, courts would not likely condone the prejudicial impact of “evidence” adduced in this fashion (see, Lego v Twomey, 404 US 477, 484-485, supra; LaFrance v Bohlinger, 499 F2d 29, 32-35, cert denied sub nom. LaFrance v Meachum, 419 US 1080, supra). People v Portelli (15 NY2d 235, cert denied 382 US 1009), on which the People heavily rely, provides no governance or guidance for this case. It is fundamentally different and contains its own cautions against improper conduct such as was utilized in the circumstances of the instant case (see also, United States ex rel. Portelli v LaVallee, 469 F2d 1239).
The Court is not unmindful of the frustration visited on the legitimate attempt to prosecute this case. But the failure and unwillingness of the recalcitrant witnesses to implicate defendant at trial came as no surprise (People v Fitzpatrick, 40 NY2d 44, 52-53, supra). However detrimental this development was to the prosecution’s case and its resolute quest for a conviction, no cognizable justification was presented for using Gonzalez’s Grand Jury testimony in this extremely prejudicial manner in the context of the over-all handling of these civilian bystander teen-age witnesses. Measured use of the awesome power of the State must remain the benchmark, and the Court is obligated to impose the strongest disincentives against serious deviations from that standard with its adverse resulting effects on the fairness of the trial given to defendant.
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.