(December 16, 1993)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NATHANIEL HILL, Appellant. [605 NYS2d 734] —Judgment, Supreme Court, New York County (Richard Andrias, J.), rendered May 23, 1990, convicting the defendant, upon a jury verdict, of 2 counts of criminal sale of a controlled substance in the second degree and 2 counts of criminal sale of a controlled substance in the third degree and sentencing him, as a predicate felony offender, to concurrent indeterminate terms of imprisonment of from 7 years to life on the second degree counts and from 4½ to 9 years on the third degree counts, affirmed.

On May 6, 1988, the Drug Enforcement Task Force initiated an investigation into an organization in Brooklyn that was purportedly selling a brand name of heroin called "Raw". As a result of that investigation, the defendant was convicted, after trial, of selling narcotics to an undercover police officer. The detective, Kevin Joseph, testified that on May 17, 1988, he and a confidential informant went to 31 Patchen Avenue in Brooklyn, where they met with the defendant for the purpose of arranging a purchase of 5 packages of heroin. After telephoning his connection, the defendant told Joseph that the heroin would be arriving shortly. A man named Bogie thereafter arrived on a motorcycle with the packages and he and Joseph agreed to a purchase price of $4000. After the defendant complained, however, that he was being cut out of the deal, Bogie raised the price to $4700. Joseph gave Bogie the $4700 from which $700 was given to the defendant.

Joseph and the confidential informant returned to 31

Patchen Avenue on June 30, 1988. After the informant contacted the defendant by beeper, he and Joseph agreed to another sale. The defendant then contacted his connection, who thereafter arrived with a brown paper bag filled with 500 glassine envelopes, which he gave to the defendant. Joseph handed over $4700 to the defendant in exchange for the bags. Although Joseph attempted to deal directly with the man who brought the narcotics, the man refused to give him his beeper number. Instead, he told Joseph that any dealings would have to go through the defendant.

Joseph and the confidential informant went to the Brooklyn location again on September 26, 1988 to meet with Andre Colon. A deal had been arranged previously by the confidential informant for Joseph to purchase $4600 worth of narcotics from Colon, a purported member of the targeted organization. While waiting for Colon to arrive, Joseph saw the defendant across the street. The defendant came over and got into Joseph's car. He then gave Joseph a glassine envelope with a different marking than Joseph had seen previously. The defendant told him that he was selling this brand on his own, apart from the organization.

After Colon arrived, he, Joseph, the confidential informant and the defendant drove in Joseph's car to a pay phone where Colon beeped his connection. They then returned to 31 Patchen Avenue where Colon and the defendant got into the confidential informant's car. Joseph and the confidential informant, in Joseph's car, then followed Colon and the defendant to Crescent and Fulton Streets, and then to 2958 Atlantic Avenue, which was a radio car repair shop. Once at this location, the defendant directed Joseph inside. Colon then entered the shop while the defendant remained outside. Colon told Joseph to get the money ready so Joseph went to his car and retrieved the $4600 from his trunk. Joseph had asked for a reduction in the $4700 he had paid previously. When he returned to the shop, Colon dropped the five paper bags which later were determined to contain 485 glassine envelopes of heroin, to the floor. Joseph knelt down to pick them up and, while still on the ground, handed up the money. The defendant, who had entered the shop, grabbed the money from Joseph, counted it and handed it over to Colon.

The defendant contends that the People failed to prove his guilt of criminal sale of a controlled substance in the second degree, with respect to this last transaction, beyond a reasonable doubt. The dissent agrees that the record fails to establish any culpable participation by the defendant in this sale,

and that his conviction on this count should therefore be reversed, and that portion of the indictment dismissed.

Viewing the evidence in a light most favorable to the People, and giving due deference to the jury's findings of credibility (see, People v Contes, 60 NY2d 620; People v Rosa, 176 AD2d 188, 189, lv denied 79 NY2d 923), we find that the defendant's guilt on a theory of accomplice liability was proven beyond a reasonable doubt. The record establishes that the defendant acted with the mental culpability necessary to commit the crime charged and that, in furtherance thereof, he solicited, requested, commanded, importuned or intentionally aided the seller to commit such crime (Penal Law § 20.00).

While mere presence at the scene of a crime with knowledge of its perpetration does not render the observer accessorily liable (see, People v Reyes, 82 AD2d 925; and see, People v La Belle, 18 NY2d 405; People v Karchefski, 102 AD2d 856), the defendant's actions, under the totality of the circumstances, were clearly designed to effectuate the commission of the crime (see, People v Reddy, 108 AD2d 945, 948). His course of conduct conflicts with the dissent's portrayal of him as a possible bystander.

The defendant, the seller of heroin to Joseph on previous occasions, accompanied his fellow member Colon to complete the sale to Joseph on September 26th. He drove with Colon to a pay phone to contact the supplier and then to the repair shop where the sale to Joseph was to take place. He directed Joseph inside and then remained outside, actions consistent with those of a lookout. He then entered the premises, grabbed the money from Joseph and counted it before handing it over to Colon. The purchase price, after a renegotiation by Joseph, was $4600, $600 more than the price originally set by Bogie, which was thereafter raised to include a cut for the defendant. Instead of receiving 500 glassines, Joseph received 485 for the discount in price. That the defendant did not negotiate or arrange this transaction, or physically hand the drugs over to Joseph did not affect his liability as an accomplice (see, People v Kaplan, 76 NY2d 140; People v Wylie, 180 AD2d 774, lv denied 81 NY2d 767; People v Jones, 104 AD2d 330). The People did not have to prove that the defendant acted with the specific intent to sell the drugs; the culpable mental state for criminal sale of a controlled substance is " 'knowledge' " (People v Kaplan, supra, at 142). In sum, the jury reasonably inferred the defendant's knowledge of and participation in the drug transaction (see, People v Dordal, 55 NY2d 954, rearg dismissed 61 NY2d 759).

Equally devoid of merit is the contention of the defendant and the dissent that the defendant's conviction on those counts charging him with criminal sale of a controlled substance in the second degree (Penal Law § 220.41 [1]) must be reduced to criminal sale of a controlled substance in the third degree (Penal Law § 220.39 [1]) because the People failed to prove, beyond a reasonable doubt, by legally sufficient evidence, that he sold at least one-half ounce of contraband. The accuracy of the procedure employed by the People's expert witness, a chemist with the Drug Enforcement Administration, to weigh the narcotics sold in the transactions, was challenged by the defense expert, a statistician.

The credentials of both witnesses, and the bases for their opinions, were presented to the jury, whose function was to resolve issues of credibility and the weight to be accorded to the evidence (see, People v Garafolo, 44 AD2d 86, 88; and see, Two Guys v S.F.R. Realty Assocs., 186 AD2d 186, 188). The jury was free to accept or reject all or any portion of the testimony of these experts (see, People v Reed, 40 NY2d 204, 208). This they in fact did, as evidenced by the acquittal of the defendant on a count charging him with criminal sale of a controlled substance in the second degree, with regard to which the People's expert testified that the heroin weighed 17.7 grams and the defense expert maintained that there was a 27% probability that the heroin actually weighed less than the statutorily required weight of one-half ounce (14.2 grams). As to the counts upon which the defendant was convicted, however, the defense expert found a significantly higher probability that the narcotics sold exceeded the statutory weight. Great deference must be accorded the jury's opportunity to view the witnesses, hear their testimony and to observe their demeanor (People v Bleakley, 69 NY2d 490, 495).

While the defendant and the dissent assail the prosecution expert's admitted lack of statistical expertise, the defense expert conceded that statistics is an inexact science in which it is impossible to achieve complete accuracy. Moreover, he testified that he was unable to employ an ideal method to reach his calculations since he was not provided with the individual glassine envelopes to weigh.

The standard of proof beyond a reasonable doubt does not require proof beyond all possibility of doubt and the jury was so charged (1 CJI[NY] 6.20). The testimony of the prosecution expert was not "so baseless or riddled with contradiction that it was unworthy of belief as a matter of law" and, despite the challenge by the defense expert, the jury was entitled to

accept this evidence *(Matter of Anthony M.,* 63 NY2d 270, 281). Concur—Rosenberger, Kassal and Rubin, JJ.

Murphy, P. J., dissents in a memorandum as follows: The defendant was charged in a five count indictment with having sold heroin on five separate occasions between May and September of 1988. The first count alleged the sale of a single glassine envelope of the drug; the second and third counts respectively alleged transactions each of which involved 500 envelopes; the fourth count, like the first, alleged the sale of one envelope; and the fifth count alleged a sale of 485 envelopes. After a trial, the jury acquitted the defendant of the sale charged in the first count, and while acquitting him of criminal sale of a controlled substance in the second degree with reference to the second count, nevertheless convicted him on that count of criminal sale of a controlled substance in the third degree. The defendant was convicted on the third, fourth and fifth counts respectively of criminal sale of a controlled substance in the second degree, criminal sale of a controlled substance in the third degree and criminal sale of a controlled substance in the second degree.

On appeal the defendant raises no challenge to his third degree sale convictions pursuant to counts two and four of the indictment, but does contest on sufficiency grounds the second degree sale convictions obtained against him under counts three and five. It is his contention that the evidence offered in proof of the sale charged in the fifth count did not establish any culpable participation by him in that sale and that his conviction of the offense alleged in the fifth count should therefore be reversed and that portion of the indictment dismissed. The defendant's claim of evidentiary insufficiency as to the proof adduced in support of his conviction of the sale charged in the third count, is more limited; he makes no challenge to the sufficiency of the evidence showing his participation in the underlying illicit transaction but rather contests whether the specific crime for which he was convicted, one which insofar as is here relevant entails the sale of at least one-half ounce of a controlled substance *(see,* Penal Law § 220.41 [1]), was proved beyond a reasonable doubt. As I believe that both of these sufficiency challenges possess merit, I dissent from the majority's determination to affirm the judgment in its entirety and would instead modify the judgment to the extent of reversing the defendant's conviction of the sale alleged in the fifth count and dismissing that count, and reducing the defendant's conviction under the third count to one for criminal sale of a controlled substance in the third

degree, an offense which may be established without regard to the weight of the contraband sold (see, Penal Law § 220.39 [1]).

The evidence relevant to the indictment's fifth count showed that on September 26, 1988 undercover detective Kevin Joseph happened to encounter the defendant in the vicinity of 31 Patchen Avenue in Brooklyn, the neighborhood in which the defendant lived. Joseph had driven to that location not to meet the defendant, but to arrange a purchase of heroin from one Andre Colon, the subject of an investigation not involving the defendant. On encountering Joseph with whom the defendant was acquainted from prior unrelated transactions, the defendant gave him one glassine envelope of heroin. It is not disputed that this transaction which became the subject of the indictment's fourth count, bore no relation to Joseph's ensuing drug purchase from Colon, which purchase would become the subject of the indictment's fifth count. Shortly after the defendant and Joseph had completed their business, they were joined by Colon who emerged from 31 Patchen Avenue accompanied by the police informant who had assisted in setting up the transaction which Joseph had come to the area to consummate. The four men entered Joseph's car and drove to a pay phone from which Colon made a call. They then returned to 31 Patchen Avenue where the defendant and Colon exited Joseph's vehicle, entered the informant's car and drove off. After an interval, Joseph and the informant (who had remained with Joseph) were instructed by telephone to proceed to an autobody shop. On arriving at the assigned location, Joseph observed the defendant outside of the shop. Joseph then went inside where he encountered Colon with whom he negotiated the details of the ensuing transaction; the People's witnesses confirmed that the defendant played no part in these negotiations. When Joseph and Colon had reached agreement, Joseph, at Colon's instruction, left the shop to retreive the purchase money from his car. Upon Joseph's return to the interior of the shop with the money, Colon dropped five packages together containing 485 glassine envelopes of heroin to the floor. Joseph knelt to gather the heroin. It was at this point, after the heroin had been passed but before Joseph who was still kneeling had made payment, that the defendant happened to join Joseph and Colon in the bodyshop. As he did so, Joseph from his kneeling position handed the purchase money up to him and he, in turn, counted it and passed it to Colon. There was no evidence that the defendant retained any of the money; nor was there other evidence that he had any stake in the transaction.

To establish the defendant's liability as an accomplice to Colon, who was clearly the principal vendor in the above-described sale, it was necessary for the People to prove both that the defendant aided Colon in bringing the sale about and that he did so while sharing Colon's intention to consummate the illicit transaction (see, Penal Law § 20.00). Plainly, neither of these conditions for assigning criminal responsibility was met. Although the defendant was in Colon's company prior to the sale and joined the principals to the transaction just as it was concluding, there is no evidence that he did anything to help Colon acheive his illegal purpose. As noted, there was no proof that the defendant played any role in arranging or negotiating the sale; he did not, to track the controlling statute's language, "solicit", "request", or "importune" the consummation of the illicit sale. Nor was there other proof of any participation by him in the actual transaction between Joseph and Colon which would suffice as a basis for the imposition of accomplice liability. Indeed, the defendant was not present until the deal was essentially complete, the contraband having already been passed, and his only role at that point—one which neither he nor Colon could have planned—was to take the money which Joseph handed to him and pass it to Colon. Obviously, the defendant's transfer of the money which Joseph chose to thrust in his direction, did not in any real sense "aid" Colon to conclude the transaction; the money might as easily have been given to Colon directly. And, it is hardly surprising given the defendant's negligible and unanticipated part in the all but complete transaction that, so far as can be told from the record, he neither expected nor received any portion of the sale proceeds.

There is, to be sure, ample basis for speculation as to the nature of the defendant's true role in the above-described transaction. It is clear that the defendant dealt in narcotics and had only a short time prior to the transaction at issue himself made a sale of heroin to Joseph. Further, the defendant was in Colon's company during the period immediately preceding the sale, and was present as the transaction wound up. Obviously the defendant knew what was transpiring. The fact remains, however, that the record provides no nonspeculative basis for the conclusion that the defendant actually did something to promote or assist in any meaningful way with the transaction. All that has been shown is that the defendant was present briefly during part of the transaction and that as an incident of his presence rather than any criminal design he acted, at the instigation of the buyer, momentarily as a

conduit of the purchase money. The law, however, is clear that mere presence, which in the final analysis is all that has been proved in this case, is not a sufficient predicate for accomplice liability (see, e.g., People v Yarrell, 75 NY2d 828; People v Tucker, 72 NY2d 849; People v Karchefski, 102 AD2d 856; People v Reyes, 82 AD2d 925). The defendant's conviction as an accomplice for his role in the sale alleged in the fifth count of the indictment should therefore be reversed and that count dismissed.

The defendant's remaining sufficiency claim concerns the adequacy of the People's proof respecting the weight of the contraband sold in the transactions alleged in those counts of the indictment pursuant to which he was convicted of criminal sale of a controlled substance in the second degree; as noted, criminal sale of a controlled substance in the second degree entails the sale of at least one-half ounce of contraband. The difficulty in this case arises from the circumstance that the People never ascertained the actual weight of the contraband involved in the transactions alleged under counts three and five of the indictment. The weight was instead estimated by a method the reliability of which was never established and indeed was seriously challenged by the defendant's expert witness.

The People's witness, Frederick Martorell, a chemist for the Drug Enforcement Administration (DEA), testified that he employed the following procedure to estimate the weight of the contraband relevant to counts three and five: he first ascertained the aggregate weight of all of the heroin-filled glassine envelopes involved in each sale; he then took from each group of glassine envelopes a smaller number of envelopes approximately equivalent to the square root of the total number of envelopes for use as a sample; he emptied the envelopes in the sample and, once empty, weighed them together, thereafter dividing the total weight of the empty sample envelopes by the number of envelopes in the sample in order to ascertain the average weight of an empty glassine sample envelope; he then multiplied the average sample envelope weight by the total number of envelopes involved in the transaction so as to obtain the approximate aggregate weight of the glassine packaging and subtracted that weight from the total weight of all of the packaged contraband involved in the transaction, the difference representing the approximate weight of the contraband sold. Martorell, who had no expertise in statistics was unable to testify as to the accuracy of the

method he had employed or, therefore, of the estimate obtained by its use.

Dr. Aaron Tenebein, Chairman of the Statistics Department at the New York University School of Business, testified for the defense as to the reliability of the above-described method. He stated that because the envelopes varied in weight there would most likely be a discrepancy between the average sample envelope weight and the overall average envelope weight and that the sampling method would therefore yield results involving some margin of error; generally speaking, the larger the sample the lower the margin of error. Dr. Tenebein explained that the reliability of the sample as a reflection of the aggregate could be ascertained by computing the degree to which each envelope in the sample deviated from the average or mean sample envelope weight. Once the standard deviation from the mean sample envelope weight had been determined, the use of an accepted statistical formula would enable one to compute the extent of the margin of error, and hence the reliability of the estimate arrived at in reliance upon the sample. Dr. Tenebein was unable to determine the actual extent of the sampling error involved in the DEA's estimate of the weight of the drugs offered in evidence against the defendant because the sample envelopes had never been individually weighed. This, however, did not prevent him from illustrating the extent of the error which might have been involved. He did this by taking the actual weight of the envelopes involved in the single envelope transactions (counts one and four of the indictment) and the average sample weight of the envelopes in each of the multi-envelope transactions (counts two, three, and five of the indictment), and used these weights as the components of a hypothetical sample. He then ascertained the standard deviation from the sample mean and using that figure computed the range of error for each of the multi-envelope transactions. As is here relevant, the DEA estimated weight of the drugs involved in the transaction alleged under count three of the indictment was 19.3 grams, 5.1 grams in excess of the 14.2 gram (one-half ounce) amount which must be passed as a condition of liability for criminal sale of a controlled substance in the second degree. However, according to Tenebein's calculations based upon the hypothetical sample, the DEA's estimate was reliable only within a margin of 12.3 grams. There was, therefore, a 21% probability that the drugs weighed less than 14 grams.

Although the validity of this result may be questioned since it is not based upon an actual, but rather a hypothetical

sample, Dr. Tenebein's analysis is richly illustrative of the very significant potential for error when an estimate is based upon a sample, particularly a relatively small one. Given the fact that individual envelopes vary in weight, there will almost always be some discrepancy between the average sample weight and the true average weight based upon the aggregate. While that discrepancy may seem minute, where, as here, it is multiplied by a factor of nearly 500, it may become extremely significant. Indeed, it may substantially impair the reliability of the estimate upon which the jury is invited to rely.

Moreover, the validity of Dr. Tenebein's specific result based upon the hypothetical sample is not ultimately at issue, and the People, accordingly, gain little if anything by attacking it, for the question in this case was not whether the defendant had proved that the weight of the contraband fell below the statutory threshold, but whether the People had met their burden of proving the contrary proposition beyond a reasonable doubt. And, clearly, they did not. In the final analysis the People's proof of the contraband's weight consisted of no more than an estimate, the accuracy of which was, on the basis of the testimony before the jury, a matter for pure speculation.[1] There was quite simply no testimony from which the jury could have inferred with the requisite certainty that the DEA estimates were reliable, much less that they were reliable to the extent necessary to support a criminal conviction.[2]

Although the People contend otherwise, it is clear that the sufficiency of the proof respecting the weight of the contraband did not turn upon the credibility of the witnesses.

---

1. Contrary to the People's argument, the task the jury was called upon to perform was not rendered any less speculative by the results of Dr. Tenebein's analyses based upon the hypothetical sample, particularly with reference to the contraband seized in connection with the indictment's fifth count where the analysis performed in reliance upon the hypothetical sample indicated only a 6% chance of error. All that Dr. Tenebein's analysis reasonably demonstrated was that given the variance in envelope weight, the DEA sampling method was bound to yield estimates differing to some potentially consequential degree from the true aggregate weight. But the illustrative analysis, based as it was upon a hypothetical sample, was not probative of more than this and, accordingly, is not properly adduced as proof from which the jury could have concluded that the contraband was in fact sufficiently weighty to support a second degree sale conviction.

2. It follows that even if the fifth count of the indictment is not to be dismissed as I believe it should be *(see, supra)*, the defendant's conviction pursuant to that count should nevertheless be reduced to one for criminal sale of a controlled substance in the third degree.

Crediting everything to which the People's witness, Martorell, testified, there persists a very real question as to the accuracy of the method by which his estimates were arrived at, a question which is not in any way resolved by Martorell's very credible admission to the effect that he had no expertise in statistics and was accordingly unable to offer an opinion respecting the accuracy of the sampling method he had been directed to employ.

Where drugs have been duly weighed using properly calibrated instruments there will be little opportunity to dispute the validity of the results obtained. Where as here, however, the weight of contraband has not been the subject of precise measurement but rather of an estimate, questions will invariably arise as to the estimate's accuracy. And, in this circumstance, unless the People are able to demonstrate that their estimate is reliable for the purpose of excluding reasonable doubt as to the sufficiency of the contraband's weight, the People's proof upon the element of weight, must, it would seem, be deemed insufficient as a matter of law. Obviously, the need for possibly long and prolix proof in support of the accuracy of an estimate as to weight, could be entirely avoided by ascertaining the contraband's actual weight, an option which, while perhaps inconvenient in the laboratory where it might entail the careful opening and emptying of many envelopes, would ultimately save considerable time and effort in court. Indeed, given the undeniable availability to the People of direct and virtually unassailable proof of the actual weight of contraband seized in connection with a second degree sale prosecution, the reason for the People's reliance upon an estimate is unclear. Be this as it may, the People's choice to rely on an estimate does not in any way reduce their burden of proving every element of the crime charged beyond a reasonable doubt and measured against this exacting standard the evidence in this case was manifestly deficient.

Accordingly, the judgment of the Supreme Court, New York County (Richard Andrias, J.), rendered May 23, 1990, convicting the defendant of two counts of criminal sale of a controlled substance in the second degree and two counts of criminal sale of a controlled substance in the third degree, should be modified to the extent of reversing the conviction of criminal sale of a controlled substance in the second degree pursuant to the fifth count in the indictment and dismissing that count and reducing the defendant's remaining conviction of criminal sale of a controlled substance in the second degree to one for criminal sale of a controlled substance in the third

degree and remanding for resentencing upon that count, and except as so modified, the judgment should be affirmed.

